F. WALLIS ARMSTRONG CO. v. Mc-
CAUGHN, Collector of Internal
Revenue.

District Court, E. D. Pennsylvania. August 12,
1927.

No. 10950.

1. **Internal revenue** ⊙⟹9(27)—**Money used for salaries, office rent, supplies, and incidental expenses held not taxable "capital" (Revenue Act 1917, §§ 209, 210 [Comp. St. §§ 6336⅜j, 6336⅜k]).**

Money used by corporate advertising agency for payment of salaries, office rent, supplies, and incidental expenses of operation *held* not taxable "capital" within Revenue Act 1917, §§ 209, 210 (Comp. St. §§ 6336⅜j, 6336⅜k).

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Capital.]

2. **Internal revenue** ⊙⟹9(27)—**Corporate advertising agency, making collections so promptly as to eliminate necessity of using its own capital, held to have only "nominal capital" (Revenue Act 1917, §§ 209, 210 [Comp. St. §§ 6336⅜j, 6336⅜k]).**

Corporation having capital stock of $100,-000, of which $90,000 represented good will and $10,000 cash, which so operated its advertising agency business that it made collections from its clients before bills for advertising space in various publications on account of its clients became due, so that it was seldom necessary to use its own capital to pay for such obligations for which it expressly made itself liable, *held* to have only "nominal capital" within Revenue Act 1917, § 209 (Comp. St. § 6336⅜j), and was therefore not taxable under section 210 of the act (Comp. St. § 6336⅜k).

3. **Internal revenue** ⊙⟹38(12)—**Rule as to burden of proof applicable to tax exemption claims does not apply in determining whether corporation has merely nominal capital (Revenue Act 1917, § 209 [Comp. St. § 6336⅜j]).**

Rule as to burden of proof applicable to cases of claims for exemption from taxation by corporation claiming to be a personal service corporation does not apply in determining whether corporation is to be classified as having no invested capital or not more than a nominal capital within Revenue Act 1917, § 209 (Comp. St. § 6336⅜j), or under some other classification.

At Law. Action by the F. Wallis Armstrong Company against Blakely D. McCaughn, Collector of Internal Revenue. Judgment for plaintiff.

Porter, Foulkrod & McCullagh, of Philadelphia, Pa., for plaintiff.

George W. Coles, U. S. Atty., of Philadelphia, Pa., for defendant.

Findings of Fact.

KIRKPATRICK, District Judge. 1. The plaintiff, until May 31, 1917, the date on which it was dissolved, was a New Jersey corporation doing business in Pennsylvania.

2. The plaintiff filed with the Collector of Internal Revenue its income and excess profits return for the portion of the year 1917 during which it was in business, disclosing net income for the period of $50,272.82, and computed its excess profits tax in accordance with the provisions of section 209 of the Revenue Act of 1917 (Comp. St. § 6336⅜j) as having "no invested capital or not more than a nominal capital." The excess profits tax computed under that section on the plaintiff's income was $3,781.82, and the income tax was $2,789.46, or a total of $6,571.28 which was duly paid.

3. On review of the case, the Commissioner of Internal Revenue made a slight reduction in income not here pertinent, but held that the plaintiff was not entitled to compute its excess profits tax under section 209, and made an assessment under section 210 of the act (Comp. St. § 6336⅜k) which provides for cases where "the Secretary of the Treasury is unable * * * satisfactorily to determine the invested capital." Under the assessment so made, the plaintiff's excess profits tax was $10,321.01, the income was $2,397.11, or a total tax of $12,-718.12, amounting to $6,146.84 more than originally paid.

4. The plaintiff, on October 23, 1927, paid the additional tax so computed and assessed under protest based upon erroneous classification, and filed claim for refund, which the Commissioner denied by letter on March 15, 1924, on the ground that assessment had been correctly made, whereupon the plaintiff brought this suit for the recovery of the additional tax.

5. The plaintiff was incorporated in 1907 (under the name of Powers & Armstrong) as the successor of a partnership engaged in operating an advertising agency, and it engaged in that business and no other during its existence, including the portion of the year 1917 under consideration. At the time of its incorporation, the plaintiff acquired the assets and assumed the liabilities of the partnership. The assets so acquired consisted of cash, $5,842.78; office furniture and fixtures, $3,206.94; bills and accounts receivable, $78,178.69; and good will, $90,-000; liabilities assumed or accounts payable amount to $77,055.15. Capital stock to the amount of $100,000 was issued, of which $90,000 was issued for good will and $10,000 for cash.

6. At the beginning of the taxable year 1917, the plaintiff's assets consisted of cash $37,653.96; good will, $90,000; furniture and fixtures, $2,344.88; and accounts re-

ceivable of $354,896.04; bills receivable in the amount of $21,057.27. The increase in net worth resulted in the main from profits earned and not paid out in dividends, but included interest on bank balances in the sum of $1,393.40. The liabilities consisted of accounts payable, $357,524.11, capital, $100,000, and surplus, $47,428.04.

7. Plaintiff's business was conducted by its representatives first getting in touch with a client or firm desiring to carry out a program of advertising. The plaintiff's representatives would study the problems of the advertiser and investigate their markets. They would then make general plans for advertising and submit them to the client for approval. These plans might include the use of magazines, circulars, booklets, or billboards. If approved, the plaintiff would contract for space in the advertising media selected and would then prepare the copy—that is, the advertisement itself—including plates, drawings, and legend, and in case of a periodical send it to the periodical for insertion at a particular date.

8. The plaintiff ordinarily entered into a written contract with its clients by which it agreed to handle clients' advertising for a certain period, with the right on the part of the plaintiff to terminate the contract if the bills submitted by it were not paid by the clients when due. By its contract, the plaintiff agreed to analyze the client's advertising situation, to advise the clients in linking the publicity campaign with their sales organization, to plan and guide the campaign, prepare copy, select media, order the spaces and insertions, oversee the appearance of the advertising, check the advertisements, audit the bills, and arrange for the printing of all the advertising matter. The plaintiff agreed to pay for the account of the client all bills from publishers, artists, plate makers, and printers. Clients agreed to pay the plaintiff the bills so paid, together with 15 per cent. for their services.

9. The plaintiff employed writers, draftsmen, artists, printers, etc., some of whom were in its employ regularly, and some of whom worked under contracts. The plaintiff added to the bills to its clients the cost to it of such work, but did not add anything additional and did not derive any profit from this practice. The amount received by the plaintiff from its clients in 1917 to cover these and similar items was about $7,000.

10. It was the plaintiff's regular practice to bill its clients so that the bills would be payable in advance of the time when the plaintiff would have to pay the publications, etc., and as a result of this they frequently had a considerable amount of cash in bank from which they would subsequently pay the publishers and other parties. Occasionally, and contrary to custom, plaintiff accepted notes in payment of accounts which necessitated the payment of bills by the plaintiff from its own funds. The amount of loss suffered by the plaintiff by reason of clients not paying their bills during the ten years of its existence was negligible.

11. The plaintiff contracted for space in the magazines and other media for the account of the particular client for whom it was acting. It did not buy the space in its own name and then sell it. However, under its contracts the plaintiff made itself responsible for the payment for the space.

12. The plaintiff received from the magazines and other advertising media a cash discount for prompt payment of bills. In all cases where the plaintiff's clients had paid them at the time when the plaintiff paid for the advertising, and in some cases where they had not, the plaintiff allowed the client the benefit of the cash discount in its bills to the client.

13. The plaintiff, during the period of January 1 to May 31, 1917, had not more than a nominal capital.

Discussion.

[1, 2] The question involved in this case is whether the plaintiff is entitled to classification under section 209 of the Revenue Act of 1917, as a trade or business having no invested capital or not more than a nominal capital for the period from January 1, 1917, to May 31, 1917, on which latter date the company was dissolved. The plaintiff had a capital stock of $100,000, of which $90,000 was issued for good will and $10,000 for cash. The collection of their accounts left them at various times with considerable sums of money on hand. It is conceded that some money was used in connection with the business. So far as the payment of salaries, office rent, supplies, and incidental expenses of operation is concerned, there is no difficulty. This does not constitute capital. De Laski, etc., Co. v. Iredell (D. C.) 268 F. 377. The government's contention in this case is mainly based upon the fact that the company, in contracting for advertising space, contracted in its own name or in such a manner as to make it responsible for the payment of the accounts, and that this constituted the use of income-producing capital.

In a recent case, the Board of Tax Appeals allowed personal service classification under the Revenue Act of 1918 (40 Stat. 1057) to a company engaged in a business like the one in question here and using almost exactly the same methods. The reasoning of the Board is clear and cogent, and it is here quoted and adopted as a part of this opinion:

"In this connection it is urged that the contract between the publisher and the advertising agent is such that the advertising agent is responsible for the payment of all bills for advertising, that recognition is extended only to agencies having good financial standing, and that capital is necessary to obtain recognition as an agency and for use in paying for space used by advertisers.

"It is our opinion that the matter of either the theoretical or legal liability, so long as the agent is not a principal dealing in the purchase and sale of space, has little to do with the question which we must decide. In determining whether capital is or is not a material income-producing factor, we must look to the use to which capital is put in the business. One agency, with no legal responsibility to pay the publisher for the advertising of its clients, may follow a consistent practice of making such payments and permitting credit facilities to its clients.

"Its extension of credit may be such as to balance the sales in its favor as against another such agency which will not finance the obligations of its clients. In such a case, capital is so used as to be material in securing and retaining income-producing business. Under such circumstances, if used to produce sufficient business, capital becomes a material income-producing factor.

"Another agency may expressly contract with the publisher to make itself liable for the payment for the advertising of its clients; yet, if it so operates its business that collections are promptly made from the clients and it becomes unnecessary to use its capital to perform the obligation it has undertaken, capital has not become a material income-producing factor. The use of capital has been potential only.

"The fact that a business has capital, or in certain contingencies might require capital, is not sufficient to deny personal service classification, if in fact capital is not used to produce income; the use to which capital is put is the controlling factor." S. A. Connover Co., B. T. A. No. 3926.

The distinction made by the Board of Tax Appeals is well taken, and the evidence in this case shows that the plaintiff so operated its business that collections were promptly made from the clients, and that as an almost invariable rule it was unnecessary to use its capital to perform the obligations that it had undertaken. This is a case in which, as the business of the plaintiff was ordinarily conducted, the use of capital was potential only.

The defendant has cited the case of Thomas E. Basham Co. v. Lucas, decided July 25th, 21 F.(2d) 550, by the District Court for the Western District of Kentucky. There are several points of difference between the facts in that case and the facts in the present case.

[3] In the first place, the taxpayer there was claiming classification as a personal service corporation, which amounts to a claim of exemption from taxation, and, of course, the rule as to burden of proof in such cases is correctly stated. In the case at hand, however, there is no claim for exemption, but the question involved is simply whether the plaintiff falls under the classification of section 209 or under some other classification. I am of the opinion that the rule as to the burden of proof in connection with the claim of exemption does not apply in this case.

In the second place, it appears from the opinion in the Basham Case that "considerable revenue was derived by the taxpayer from using its funds to pay the bills of the publishers as they became due, thereby securing a substantial discount for prompt payment." The court then says that, if a material part of its income was derived from this practice, it would be income derived from the use of capital, and, inasmuch as the taxpayer failed to show how much profit was derived in this matter, the burden of proof was not met, and the presumption is that the capital was income-producing. A different situation, however, exists in the present case. The testimony on that particular point is confused and unsatisfactory, but I have found as a fact that it was not customary with the company to obtain the benefit of a cash discount for itself.

The third point of distinction is that in the case at hand no profit was made upon work of artists and draftsmen contracted for by the taxpayer outside of its own force. The cost to the plaintiff of this work was simply included in their bills to their clients. In the Basham Case, "payments were made directly to the art organization in the same way as any other account is ordinarily paid, and the plaintiff in turn charged the advertiser a profit on what it had cost to

have this work done. This difference in 1919 amounted to a profit of $3,496.15." I agree with the conclusion that this profit was derived from the use of capital, but in the case at hand there is no evidence that any profit was derived in this manner. The evidence is quite positive to the effect that the plaintiff in this case conducted its business in such a manner and with clients of such character and financial standing that the use of capital to finance their account was ordinarily unnecessary and that instances to the contrary were occasional and isolated.

Both the Conover Case and the Basham Cases cited and discussed here are cases involving classification as personal service corporations under the Revenue Act of 1918, but, while the question is not exactly the same as that involved in this case, it is analogous, and the reasoning of the two cases referred to is applicable to the language of section 209 of the Revenue Act of 1917.

For the reason stated, the conclusion is reached that the plaintiff company is a company having not more than a nominal capital within the provisions of title 2, § 209, of the Revenue Act of 1917.

Judgment will be entered for the plaintiff in the amount of 6,146.84, with interest as claimed in the statement.