**FULLER & SMITH v. ROUTZAHN, Collector of Internal Revenue.**

District Court, N. D. Ohio, E. D. November 17, 1927.

No. 14396.

1. **Internal revenue** ☞7(28), 9(27)—That some funds of advertising agency corporation were used by manufacturing corporation did not make former business corporation for taxation purposes (Revenue Act 1918, § 200 [Comp. St. § 6336⅛a]).

Where some stockholders of general advertising agency corporation organized corporation for purpose of manufacturing tractors, and plaintiff advertising agency corporation had no corporate power to engage in manufacturing business, plaintiff's use in tractor corporation of some of its funds, whether as loan or investment, was an ultra vires act, and such use of funds did not make it trading or business corporation, so as not to be entitled to classification as personal service corporation, under Revenue Act 1918, § 200 (Comp. St. § 6336⅛a).

2. **Internal revenue** ☞7(28), 9(27)—Advertising agency corporation, whose principal stockholders devoted some time to tractor business as side issue, was "personal service corporation" for taxation purposes (Revenue Act 1918, § 200 [Comp. St. § 6336⅛a]).

That some of plaintiff's principal stockholders devoted some of their time and energies to tractor corporation, in which they held stock, as side issue, where they performed for plaintiff same active services that they had previously performed, did not deprive them of right to claim they were regularly employed in active conduct of affairs of plaintiff advertising agency corporation, and it was entitled to classification as "personal service corporation" under Revenue Act 1918, § 200 (Comp. St. § 6336⅛a) since statute is not susceptible of construction so narrow as to exclude all outside activities of principal stockholders.

3. **Internal revenue** ☞7(28), 9(27)—That advertising agency corporation was theoretically liable for clients' advertising bills was immaterial, on question whether it was personal service corporation for taxation purposes (Revenue Act 1918, § 200 [Comp. St. § 6336⅛a]).

That general advertising agency corporation may have been theoretically liable for its clients' advertising bills was immaterial, on question whether it was entitled to classification as personal service corporation under Revenue Act 1918, § 200 (Comp. St. § 6336⅛a), where it so conducted its business that it did not need or use its capital.

4. **Internal revenue** ☞7(28), 9(27)—Advertising agency corporation, having authorized capital of $125,000, where personal services accounted for 99.24 per cent. of income, was personal service corporation for taxation purposes (Revenue Act 1918, § 200 [Comp. St. § 6336⅛a]).

In determining whether corporation is entitled to classification as personal service corporation under Revenue Act 1918, § 200 (Comp. St. § 6336⅛a), controlling consideration is not presence of capital, but its use in earning income, and where advertising agency corporation had authorized capital of $125,000, but its earnings from personal services rendered clients accounted for 99.24 per cent. of its total income, and its return from invested capital and other sources amounted to .76 per cent. of its income, it was personal service corporation.

5. **Internal revenue** ☞7(28), 9(27)—Use of capital required to maintain office does not make capital material income-producing factor, as respects classification of corporation for taxation purposes (Revenue Act 1918, § 200 [Comp. St. 6336⅛a]).

Presence and use of capital, such as is required to provide and maintain an office with elaborate present-day equipment and to pay salaries of employees, do not make capital material income-producing factor, depriving corporation of right to classification as personal service corporation under Revenue Act 1918, § 200 (Comp. St. § 6336⅛a).

6. **Internal revenue** ☞7(28), 9(27)—Advertising agency corporation, maintaining art department, was personal service corporation for taxation purposes (Revenue Act 1918, § 200 [Comp. St. § 6336⅛a]).

Where general advertising agency corporation maintained art department, part of work being performed by means of employees regularly or temporarily employed, greater part of which was procured from outside sources, and it bore an insignificant relation to and was incidental to corporation's main business, maintenance of art department did not deprive corporation of its right to classification as personal service corporation under Revenue Act 1918, § 200 (Comp. St. § 6336⅛a).

7. **Internal revenue** ☞7(28), 9(27)—Statute classifying corporations for taxation purposes does not classify stockholders on basis of amount of stock owned (Revenue Act 1918, § 200 [Comp. St. 6336⅛a]).

Revenue Act 1918, § 200 (Comp. St. § 6336⅛a) defining term "personal service corporation" for purposes of taxation, does not classify stockholders on basis of amount of stock owned or held, and does not distinguish between majority and minority stockholders.

8. **Internal revenue** ☞7(28), 9(27)—Limitations in statute defining personal service corporation for taxation purposes should not be stressed to point of destroying major purpose of law (Revenue Act 1918, § 200 [Comp. St. 6336⅛a]).

Specific limitations in Revenue Act 1918, § 200 (Comp. St. § 6336⅛a), defining term "personal service corporation" for taxation purposes, should not be stressed to point of destroying major purpose of law, which is to distinguish between corporations engaged in trade, merchandising, and manufacturing, in which much capital is required, and without which profits may not be earned, and corporations performing personal services, in which large capital is not usually required or necessary to its efficient conduct.

**9. Internal revenue ⬅7(28), 9(27)—Controlling test of whether corporation is personal service corporation for taxation purposes is whether its activities are carried on by owners regularly engaged (Revenue Act 1918, § 200 [Comp. St. § 6336⅛a]).**

Controlling test of whether corporation is personal service corporation for taxation purposes, under Revenue Act 1918, § 200 (Comp. St. § 6336⅛a), is whether activities of corporation are carried on by its owners regularly engaged, not whether some of its owners have greater or less amount of stock, since law intended to forbid absentee stockholding interests of material size.

**10. Internal revenue ⬅7(28), 9(27)—Where minority stockholders received more salary and bonus than majority stockholders, but all stockholders were active in conducting business advertising agency, corporation was personal service corporation for taxation purposes (Revenue Act 1918, § 200 [Comp. St. § 6336⅛a]).**

Where three stockholders of advertising agency corporation, owning not less than 66.1 per cent. of stock, received as salaries and bonuses $33,376.39, and as dividends $26,740, and minority stockholders, owning 33.9 per cent. of stock, received as salaries and bonuses $62,-684.34, and as dividends $13,535, and other employees, performing clerical work, received salaries aggregating $37,571.98, but all stockholders were active in conduct of plaintiff's business, and minority stockholders were all former employees, and their salaries and stockholding interests were apportioned with due regard to their ability and relative importance, corporation was personal service corporation for taxation purposes, within meaning of Revenue Act 1918, § 200 (Comp. St. § 6336⅛a).

At Law. Action by Fuller & Smith against Carl F. Routzahn, Collector of Internal Revenue for Eighteenth District of Ohio, to recover income and excess profits taxes paid under protest. Judgment for plaintiff.

Baker, Hostetler & Sidlo, of Cleveland, Ohio, for plaintiff.

A. E. Bersteen, U. S. Atty., of Cleveland, Ohio (C. M. Charest, Gen. Counsel Bureau of Internal Revenue, and Ralph E. Smith, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., of counsel), for defendant.

WESTENHAVER, District Judge. The question involved in this case is whether plaintiff is entitled to classification as a personal service corporation under section 200, Revenue Act of 1918 (Comp. St. § 6336⅛a). It was denied this classification by the Commissioner of Internal Revenue, and assessed income and excess profits taxes for January, 1918, and for the year ending January 31, 1919, as a trading or business corporation. The taxes so assessed were paid under pro-

test. This action is to recover back the sums so paid. Jury trial has been waived in writing. All jurisdictional conditions precedent are admitted. The controversy turns in part on the proper construction of section 200 and in part on the evidence.

The Revenue Act of 1918 creates for income taxing purposes at least two classes of corporations. One is known as a personal service corporation. Others are corporations engaged in trade, manufacturing, and merchandising, and using and employing capital in earning income. The income of the first is taxable at the rate and in the same manner as the income of partnerships. Section 200, which defines a personal service corporation, is quoted in the margin.[1] The last part of the section, pertaining to foreign and other corporations, is without application. Whether plaintiff is entitled to the classification sought is controlled by the first part of the section. From the language used it is apparent that the following conditions are essential to such classification: (1) Plaintiff must be engaged in rendering personal service, as distinguished from trading, merchandising, or manufacturing; (2) the principal stockholders or owners must be regularly engaged in the active conduct of its affairs; (3) its capital, whether invested or borrowed, must not be a material income-producing factor; (4) its income, sought to be taxed, must be ascribed primarily to the activities of its principal owners or stockholders. Defendant insists that the last three conditions are not present.

That plaintiff was primarily engaged in performing personal service cannot be seriously questioned. It is, and during the period under investigation was, a general advertising agency. It was organized February 1, 1917, succeeding to the business and assets of a partnership bearing the same name and having the same owners. Briefly stated, the services rendered by it as an ad-

---

[1] "Sec. 200. That when used in this title * * * The term 'personal service corporation' means a corporation whose income is to be ascribed primarily to the activities of the principal owners or stockholders who are themselves regularly engaged in the active conduct of the affairs of the corporation and in which capital (whether invested or borrowed) is not a material income-producing factor; but does not include any foreign corporation, nor any corporation 50 per centum or more of whose gross income consists either (1) of gains, profits or income derived from trading as a principal, or (2) of gains, profits, commissions, or other income, derived from a Government contract or contracts made between April 6, 1917, and November 11, 1918, both dates inclusive. * * *"

vertising agent consist in counseling and advising clients in connection with advertising their services and products. Such counsel is given only after diligent and thorough study of the production and services its client has to sell. This study is directed to an investigation of the present and potential market for such products and services, an analysis of all factors of distribution, a survey of all advertising media and means which can be profitably used to market the products and services to consumers, having at the same time reference to the character, physical requirements, and costs of such advertising. The foregoing services were performed for a retainer fee, usually agreed upon in advance. When and if an advertising campaign is determined upon as a result of such studies and counsel, plaintiff renders other and additional services, such as writing, designing, and illustrating all advertisements in exhibit form, placing orders for space with publishers of journals and periodicals, transmitting advertising copy, checking and verifying insertions of the same, and generally all such services as are incidental to this advertising.

The courts, as well as the Board of Tax Appeals, have uniformly held that services of this nature are personal services, and that a corporation rendering the same is entitled to classification as a personal service corporation, unless deprived thereof because some of the limiting conditions of section 200 are present. As in the present case it is so contended with respect to the last three conditions, it becomes necessary to consider the same with due care.

First, it is urged that the principal stockholders or owners were not regularly engaged in the conduct of its affairs. This contention rests primarily on the activities of certain stockholders in connection with the Craig Tractor Company. When the corporation was organized, its capital stock was owned by six persons. Of these owners, F. R. Fuller and Harry Dwight Smith each held 330 shares, Norman Craig and Arthur Judson each held 75 shares, C. Madden and Patrick W. Murphy each held 26 shares, and C. E. Horton held 40 shares. In the interval prior to January 31, 1919, Fuller had retired and other stockholders had been admitted, the nature and extent of which changes will be later stated. For present purposes it is sufficient to say that Smith, Craig, Judson, Madden, Murphy, and Horton were at all times the largest stockholders, and never owned less than two-thirds of the capital stock. During this period, as a result of studies made of the tractor industry, Smith,

23 F.(2d)—61

Judson, and Craig became persuaded that there was an opportunity for making and selling a farm tractor. They organized a corporation for that purpose. A factory site and equipment were procured, a tractor was designed, and two experimental tractors were built. Plaintiff rendered some advertising service to the tractor company, for which it received some $2,100. It also permitted the lending or investing therein from its surplus funds of the sum of $28,000. It permitted most of the office and clerical work of the enterprise to be conducted from its own office and by its own employees. Except as to the item of $2,100, plaintiff received no income from the tractor company or its investment therein. The project proved a failure, and everybody's investment therein a total loss.

[1] Plaintiff was not engaged in making tractors. The tractor corporation was a separate and independent enterprise. The plaintiff had no corporate power to engage in a manufacturing business. If some of its funds were used therein, no income resulted. Its use therein of its funds, whether as a loan or an investment, was an ultra vires act. In Alexander & Garrett v. United States (D. C.) 21 F.(2d) 547, a personal service classification was allowed, notwithstanding some of the corporate capital was invested in a livery stable, which produced some income not held to be material in amount, and some was invested in a lease of an office building which produced a loss. With the principle thus declared we agree.

[2] However, inasmuch as Smith, Judson, and Craig were among the plaintiff's principal stockholders, and yet devoted some of their time and energies to the Craig Tractor Company, it is insisted that they were not regularly engaged in the active conduct of plaintiff's affairs. The evidence shows that during this period they were performing for the plaintiff the same active services that they had performed before and since, that they carried on the same work and produced the same results, and that such time and energy as were given to the tractor enterprise in no wise diminished their usefulness to the plaintiff, or interfered with the efficiency of their services in its behalf. The tractor enterprise was with them only a side issue. It was hoped that the enterprise might, but it did not, grow into an active business. If it had, the latter might have become their regular employment. But, under the circumstances, it does not deprive them of the right to claim that they were regularly employed in the active conduct of the plaintiff's affairs.

The language of section 200 is not sus-

ceptible of a construction so narrow as to exclude all outside activities of the principal owners or stockholders. The language is "regularly engaged," not "exclusively engaged." These important stockholders were regularly, actively, and continuously engaged in the conduct of its affairs. This was their regular and principal employment. They were none the less regularly, actively, and continuously engaged, even though they may have devoted some time and energy to the abortive tractor enterprise as a side issue. This conclusion is in accord with the ruling of the Board of Tax Appeals in Lee Live Stock Commission Co. v. Commissioner, 7 B. T. A. 532, and nothing in conflict is found in Matteson v. Willcuts (D. C.) 12 F.(2d) 447.

Secondly, it is contended that the plaintiff's capital was a material income-producing factor. In support of this contention it is urged that plaintiff had a substantial capital, greater than was normally required in its business; that as a result of the presence of such capital it had a good credit rating; that it used some part thereof in producing or procuring art work for its clients; and also that it bound itself to publishers for its clients' advertising bills, and used at times its capital in paying these bills. I am not certain but that defendant does not make a like contention with respect to the Craig Tractor Company. But, if so, what has already been said is adequate, and the contention will be disregarded.

When plaintiff organized, it had an authorized capital of $125,000. It had an issued capital stock of the par value of $90,000, of which $15,000 was issued for good will. On January 31, 1918, it had assets of $136,504.07, and outstanding capital stock of the par value of $96,500. On January 31, 1919, it had assets of $167,761.83, and outstanding capital stock of the par value of $115,500. Plaintiff did not need and did not actually use in its business more than a third of this amount of capital. The increase in assets during the period in question was chiefly due to payments made by new stockholders for the capital stock issued to them. The capital not needed was invested, part in Liberty Bonds, and part in loans to or notes of its several stockholders. Its earnings from personal services rendered to clients account for 99.24 per cent. of its total income. Its return from its invested capital and other sources amounts to .76 per cent. of its income. The important, if not the only, reason for having this excess capital, would seem to be the legal prohibition against impairment of outstanding capital stock. It

was built up from the payments of stockholders for capital stock, and not accumulated from earnings. The annual earnings, after the payment of salaries and expenses, were distributed as dividends.

Nor did plaintiff buy and sell or otherwise trade in advertising space. Its method of doing business is the same as that described in several opinions of the Board of Tax Appeals and of the District Courts dealing with advertising agencies. After its study and investigation of a client's problem and the submission to and approval by a client of a plan of advertising, a contract was entered into with the client, designating plaintiff as its advertising agent. This contract provided for the performance of services substantially as already outlined. Plaintiff did not contract for space on its own account. It merely reserved advertising space for specific clients. If the client for whom the space was reserved did not use it, plaintiff could not transfer it to another client. The publisher rendered its bills direct to the plaintiff. The advertiser made payment direct to the plaintiff. The advertising space billed by plaintiff to its client in no case exceeded the publisher's card rates. The publisher, with whom plaintiff reserved space and placed advertising, allowed the plaintiff a discount, usually 10 per cent., from its published card rates. Sometimes a small discount in addition was allowed for prompt payment. The plaintiff's income consisted in the commission or differential between the publisher's card rates, paid by its clients, and the amount paid over by plaintiff to the publisher. In other words, the discount allowed by the publisher to the advertising agent and the discount for cash payment made up substantially plaintiff's entire income. Its other source of income consisted of the retainer fee paid by its client; but, whenever an advertising program was agreed upon, plaintiff's retainer was credited on the commission received, and, whenever the commission equaled the retainer, no separate income from that source resulted.

[3] This method of doing business was uniform. In practice, plaintiff arranged its due dates with its clients in time to get in their money before the publisher's bills had to be paid. If a cash discount for prompt payment was realized, plaintiff gave the benefit of it to its client. In only one instance during the period in question did any of plaintiff's clients fail to pay on time. So that, except in this single instance, plaintiff was never obliged to use other funds to pay the publisher, or ever extended credit to a client. Defendant's counsel stresses in this connec-

tion two considerations. It is said that this method of doing business made plaintiff legally liable to the publisher for its client's advertising bill. This may or may not be true. No opinion with respect thereto need be or is expressed. If, in point of fact, the plaintiff so conducted its business that it did not need or use its capital, the fact that it was theoretically liable becomes immaterial. It is further said that plaintiff's capital gave it a financial standing and entitled it to a commercial rating. This is probably true. Yet the evidence is convincing that plaintiff's business success was not due to the presence of capital, or to its financial rating, but that its standing in the advertising world, on which its business success was based, was due to the prestige of Smith and other principal stockholders. Clients sought plaintiff's services because of that professional standing and reputation, and not because of the financial rating of plaintiff.

[4, 5] The holdings of the courts, as well as of the Board of Tax Appeals, when dealing with this question, are uniform that it is not the presence of capital, but its use in earning income, that is the controlling consideration. Those holdings likewise are to the effect that the presence and use of capital, such as required to provide and maintain an office, with elaborate present-day equipment, and to pay salaries of employees, do not make capital a material income-producing factor. Such use of capital is incidental. In a modern law office, one-third of the gross income is usually absorbed in this way. In this respect, the cases arising under section 209, Revenue Act of 1917 (Comp. St. § 6336⅜j), are in point. That section provides that trading or business corporations having no invested capital, or only a nominal capital, are to be classified separately and taxed as a partnership. Advertising agencies and other corporations doing business in the same manner as plaintiff, and having as much capital, and making an equivalent use of it, were held to be entitled to the classification. See Park Amusement Co. v. McCaughn (D. C.) 14 F.(2d) 553; F. Wallis Armstrong Co. v. McCaughn (D. C.) 21 F. (2d) 636; De Laski & Thropp Co. v. Iredell (D. C.) 268 F. 377, affirmed (3 C. C. A.) 290 F. 955. See, to the same effect, under section 200, Revenue Act of 1918, Appeal of Massengale Advertising Agency, 2 B. T. A. 26; Appeal of S. A. Conover Co., 6 B. T. A. 679; Geo. B. Ricaby Co. v. Nauts (D. C.) 19 F.(2d) 271; Alexander & Garrett v. United States (D. C.) 21 F.(2d) 547.

Plaintiff's income, otherwise than from its retainer fees and commission on advertising placed with publishers, is so insignificant as to be immaterial. In the matter of cash discounts, as distinguished from commission, plaintiff lost $3,204.17. This loss was due to the fact that its client computed the discount on the publisher's card rating, whereas plaintiff, in paying the publisher, computed the discount only on the net rate. Likewise, in the so-called art department, plaintiff suffered a loss of $3,664.84. Hence all of plaintiff's income, except .76 per cent. derived from investments, is the direct result of personal service rendered.

[6] The maintenance by plaintiff of an art department is much stressed. Part of this work was performed by means of employees regularly or temporarily employed. The greater part of it was procured from outside sources. As the result of experience, plaintiff finally abandoned its inside department and procured all art work outside. As to the outside work, actual cost only was billed to clients. As to the inside production, it suffered the loss already stated, which did not include all expense incurred in connection therewith. The total bears an insignificant relation to plaintiff's main business. This art work, it seems to me, was plainly a personal service incidental to the major service plaintiff undertook to perform for its clients. It was not trading, merchandising, or manufacturing art work. Plaintiff could not well perform its advertising service without giving visual form to its clients' advertising, and this required the preparation of designs and illustrations. In substance, this work was no different from written copy produced and furnished.

Thirdly, it is contended that plaintiff's income is not to be ascribed primarily to the activities of its principal owners or stockholders. In support of this contention it is urged that plaintiff has a large number of small stockholders sustaining to it primarily the relation of employees, and to whom are paid large salaries; that it has other employees, some performing duties of the same nature as those of its principal stockholders, and hence that plaintiff's income is not to be ascribed primarily to the activities of its principal stockholders, but largely to the activities of minority stockholders having each a small block of stock, and to salaried employees. In my opinion, this is the weightiest consideration making against plaintiff's right to the desired classification. It is a consideration which lurked in the record in some of the cases considered by other courts and the Board of Tax Appeals, in which the

desired classification was allowed, but the full significance of these elements does not seem to have heretofore been given adequate thought. First the important facts will be stated, and later the law will be considered.

The holdings of the several stockholders have already been sufficiently stated and will be repeated only in terms of percentages. On January 31, 1918, Smith held 57 per cent., Craig 10 per cent., Judson 12.1 per cent., Madden 6.1 per cent., Horton 7.3 per cent., Murphy 4.9 per cent., and Charles E. Haring 2.6 per cent. On January 31, 1919, Smith held 47.6 per cent., Craig 8.4 per cent., Judson 10.1 per cent., Madden 5.1 per cent., Horton 6.1 per cent., Murphy 4 per cent., Haring 2.1 per cent., Fawcett, Wrigley, and Belsey 2.1 per cent., Spiro, Day, and Dewitt 1.8 per cent., Flynn 1.3 per cent., Bresnan, Gymer, Jacobs, and Jones .9 per cent. The dates of the several changes in stockholding interests are immaterial. Thus it appears that on the last-named date, and at all times, Smith, Craig, and Judson owned not less than 66.1 per cent. They received as salaries and bonuses $33,376.39, and as dividends $26,740. Defendant classifies them as principal owners or stockholders. The remaining stockholders owned 33.9 per cent. They received as salaries and bonuses $62,684.34, and as dividends $13,535. Defendant classifies them as minority stockholders. In addition thereto, there were many other employees who received salaries or wages aggregating $37,571.98.[2] As appears from schedule 7 annexed to the stipulation of facts, these employees were in fact employees, such as telephone operators, clerks, stenographers, bookkeepers, and office boys. Many of them were employed temporarily, and only for short periods of time. Three of them are described as artists, as to whom it may properly be said that their activities were not other or different from those of outside artists who were specially employed. One is classified as a research director, and he is the only one as to whose activities there can be any reason for thinking he performed other than purely clerical or minor duties. On the whole, it must be found that the employees to whom these salaries were paid were clerks and assistants, such as are found in every law office, and whose work bore no material relation to the success of the business, either as a business getter or as a directing head. The question, on the facts, narrows itself, I think, to the classification as between principal and minority stockholders.

[7] Section 200 does not classify stockholders on the basis of the amount of stock owned or held. It does not distinguish between majority and minority stockholders. Nor have the regulations promulgated by the Treasury Department ever made a like distinction. These regulations recognize a distinction between active and nonactive stockholders. Article 1529 prescribes that no definite percentage of stock or interest shall be taken as a conclusive test as to whether the active conduct of the corporation's affairs is to be deemed that of the principal stockholders. It further prescribes that no corporation may make a return in the first instance on the basis of being a personal service corporation, unless at least 80 per cent. of its stock is held by those regularly engaged in the active conduct of its affairs.

Thus it appears that the practical interpretation given to section 200 by officials charged with its administration is to classify stockholders between active and inactive, and to disregard majority and minority stockholders. And such, also, I think, has been the general holding of the courts and of the Board of Tax Appeals. In Matteson v. Willcuts (D. C.) 12 F.(2d) 447, a personal service classification was denied because one stockholder, owning 16 per cent., was not active, and another stockholder, owning 20 per cent., was regularly employed in another business, and limited his participation to consultation at lunch or after office hours with the active stockholders having charge of its affairs. On the other hand, in Appeal of S. A. Conover Co., supra, a personal service classification was allowed, although practically all the stock was held by one active stockholder, and numerous shares were distributed in small lots among former employees, who continued active in its affairs. This is the latest expression on the subject by the Board of Tax Appeals brought to my attention. If it is sound law, it controls the present case. In Geo. B. Ricaby Co., 1 B. T. A. 512, two stockholders owned 75 or the 84½ shares. One owned 8.8 per cent., and two others each owned 1.2 per cent. The stockholder owning 8.8 per cent. was one of the principal executive officers. Another, who owned only 1.2 per cent., was in charge of the taxpayer's loan department, one of the principal branches of its business, and was also in charge of its main office. The taxpayer also had three branch offices under the supervision of branch managers, no one of whom was a stockholder. The taxpayer was

---

[2] These percentages and figures are taken from defendant's brief, and, while not verified, are so nearly accurate that any errors therein become immaterial.

conducting a real estate agency, and its sales manager was not a stockholder. At one time the company employed as many as 75 salesmen, none of whom, it seems, was paid a salary, but all of whom were compensated by commissions on sales effected by them. Undoubtedly the salaries paid to these small stockholders and employees largely exceeded the profits of the two large stockholders. It was held by my associate, Judge Killits, that the taxpayer was entitled to a personal service classification. See Geo. B. Ricaby Co. v. Nauts (D. C.) 19 F.(2d) 271. Other opinions of the Board of Tax Appeals and of the courts to the same effect can be found. The only case in substantial conflict is an earlier decision of the Board of Tax Appeals of Patterson-Andress Co., Inc., 6 B. T. A. 392. I admit my inability to reconcile this case with the later case of S. A. Conover Co., 6 B. T. A. 679.

[8-10] Upon mature reflection, I am of opinion that the rulings in the several cases cited correctly interpret the law. The law was directed at absentee stock ownership. If the service rendered is in the nature of personal service and is rendered by the owners of the business, the law intended a separate classification for income and excess profits taxes. It was intended to give corporations performing services of this nature and in this manner the same tax position as a partnership. The dominating purpose was to distinguish between corporations engaged in trade, merchandising, and manufacturing, in which much capital is required, and without which profits may not be earned, and corporations performing personal services, in which large capital is not usually required or necessary to its efficient conduct. The discrimination is between income earned by capital and income earned by personal effort. The specific limitations in section 200 were inserted in aid of this dominant purpose and to prevent evasion. They should not be stressed to the point of destroying the major purpose of the law. Sections 200 and 218, Revenue Act of 1918 (Comp. St. §§ 6336⅛a, 6336⅛i), tax personal service at the same rate and in the same manner as partnerships. The number of partners and the amount of their respective interests is not made a test. So, under this section, the amount of the interest of the several stockholders is not to be taken as a controlling test. The controlling test must be looked for in another direction. It is whether the activities of the corporation are carried on by its owners regularly engaged, not whether some of its owners have a greater or less amount of stock. The law

intended to forbid absentee stockholding interests of a material size. The administrative regulation already cited impliedly declares that an absentee ownership of 20 per cent. is not material, in the absence of some other important feature.

In this case all the stockholders were active in the conduct of plaintiff's business. The minority stockholders were all former employees, and were admitted to participation presumptively because they had proved their ability to direct and carry on the plaintiff's affairs. Their salaries and stockholding interests were no doubt apportioned with due regard to their ability and relative importance. Nothing appears to indicate that such action was a subterfuge to get a different classification for taxation purposes. It would, I think, lead to endless confusion if we were now to introduce into the law an additional classification among stockholders, so that, instead of active and nonactive stockholders, we should have in each case to reckon with majority and minority stockholders. Instead of having to consider, as we do now, whether the stockholders as a group are the principal owners and are regularly engaged, we should have also to consider whether the taxpayer's income is to be mainly ascribed to the activities of some one rather than some other active stockholder, depending upon the size of the stockholder's ownership. In my opinion, Congress did not contemplate such a test. The law, I fear, would become unworkable if we should adopt it.

All the authorities cited have been duly considered. For convenience they are grouped in the margin.[3] In addition to what has already been said, further review in detail is unnecessary. Some of them arose under sec-.

---

[3] Hubbard-Ragsdale Co. v. Dean (D. C.) 15 F.(2d) 410; Park Amusement Co. v. McCaughn (D. C.) 14 F.(2d) 553; F. Wallis Armstrong Co. v. McCaughn (D. C.) 21 F.(2d) 636; Thos. E. Basham v. Lucas (D. C.) 21 F.(2d) 550; Geo. B. Ricaby Co. v. Nauts (D. C.) 19 F.(2d) 271; Matteson v. Willcuts (D. C.) 12 F.(2d) 447; De Laski & Thropp v. Iredell (D. C.) 268 F. 377, affirmed (3 C. C. A.) 290 F. 955; J. H. Lane Co., Inc., v. United States, 62 Ct. Cl. 721, decided December, 1926; Railroad Stevedoring Corp'n v. Bowers (D. C.) 7 F.(2d) 781; Gus Sun Booking Co. v. Deane (D. C.) 10 F.(2d) 378; Appeal of Massengale Advertising Agency, 2 B. T. A. 26; Alexander & Garrett v. United States (D. C.) 21 F.(2d) 547; Innes-Behney Optical Co. v. Commissioner, 7 B. T. A. 982; Appeal of Patterson-Andress Co., Inc., 6 B. T. A. 392; Continental Accounting & Audit Co. v. Commissioner, 7 B. T. A. 330; F. J. Ross, Inc., v. Commissioner, 7 B. T. A. 196; Appeal of S. A. Conover Co., 6 B. T. A. 679; Lee Live Stock Commission Co. v. Commissioner, 7 B. T. A. 532.

tion 209, Revenue Act of 1917. In so far as they classify trading or business corporations, the uniform tendency is to support my conclusion. All the District Court cases arising under section 200 are, I think, in agreement with my conclusion, except perhaps Thomas E. Basham v. Lucas (D. C.) 21 F.(2d) 550. The decisions of the Board of Tax Appeals, of which many are without opinion, appear to be in conflict, as was pointed out by Judge Killits in the Ricaby Case; but most of them are in accord with my conclusion, and the latest of these, Appeal of S. A. Conover Co., supra, is in entire agreement.

In several cases an opinion is expressed that the rule requiring a taxpayer claiming an exemption from a taxing law, to show himself clearly entitled thereto, is applicable to a corporation claiming a personal service classification under sections 209 and 218. I do not deem it necessary to express a definite opinion on this question, but I deem it fitting to record a doubt. The question is, I think, not one of exemption from taxation, or even of exemption from the general provisions of a law otherwise applicable, but is within which set of taxing provisions a taxpayer falls. The act provides two classes of corporations, and provides a different manner for computing the tax. Hence the inquiry must be in which class a particular corporation is to be placed. Even if it be admitted that the burden is upon a taxpayer enjoying a corporate form of organization to show in which class it is to be placed, nevertheless no greater burden of proof is required, I think, than in determining any other simple issue of fact.

Judgment will be rendered in plaintiff's favor for the amount claimed in its petition.