### WILLIAM A. BRADY THEATRE CO. v. COMMISSIONER OF INTERNAL REVENUE.

#### No. 288.

Circuit Court of Appeals, Second Circuit.
June 9, 1930.

Henry E. Kelley, of New York City (John Drye, Jr., of New York City, of counsel), for petitioner.

G. A. Youngquist, Asst. Atty. Gen., and J. Louis Monarch and A. H. Conner, Sp. Asst. Attys. Gen. (C. M. Charest, Gen. Counsel, Bureau of Internal Revenue, and Robert L. Williams, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., of counsel), for respondent.

Before MANTON, L. HAND, and CHASE, Circuit Judges.

L. HAND, Circuit Judge.

The taxpayer is a New York corporation formed to produce plays. It had a small capital of ten thousand dollars, paid in cash by its four shareholders in equal shares. It got a five years' term in a New York theatre, which was building when it was formed, for which it was to pay a yearly rental of $32,500 and taxes of about $13,000; the value of this term does not appear. The shareholders agreed among themselves to keep the theatre going, and produced three plays during the year here in question, which ended on July 31, 1920. Of these the first and third were failures and were quickly taken off, but the second succeeded in holding the boards for the greater part of the season.

The arrangement was for one of the four shareholders to "produce" a play, and for the company to furnish the theatre. The producer bought the costumes, and paid the

actors and any extra stage hands not of the regular staff; he also was liable for any extra electricity used. The company maintained, and of course paid, a standing staff of ticket sellers at the booth, ushers, cleaners, watchmen, stage hands and the like; it heated and lighted the theatre, paid some part of the advertising and a few small sundries. Producer and theatre shared equally the gross receipts up to five thousand dollars, and divided the balance, forty per cent. to the theatre, and sixty per cent. to the producer.

On January 25, 1917, the shareholders voted to themselves each twenty-five hundred dollars, as compensation for their services for the five years ending August first of that year. Nothing of the sort was done again until December 12, 1923, when for the purpose of making a claim of tax deduction for the fiscal years ending July 31, 1919, and 1920, at a directors' meeting a resolution was passed giving seventy-five hundred dollars to each of two shareholders, and fifteen thousand dollars to a third, for every year after July 31, 1918; these "salaries however to remain in the treasury of the company, subject to such disposal of the same as might be later determined upon by the Board of Directors."

The grounds for this award were the putative services rendered by the three shareholders in the conduct of the business. Why the fourth shareholder, who produced the successful play, was omitted does not appear. All four met weekly or more often as might be advisable, and in general gave so much time as was necessary to the conduct of the company's business, co-operating "actively for the successful conduct of the theatre." The president, who was voted the larger salary, was engaged in many other theatrical ventures, and none of the four took any part in staging the plays, though all helped to carry them on.

The appeal raises two points; whether the company was a "personal service corporation" under section 200 of the Act of 1918 (40 Stat. 1058); whether, if not, the salaries were "ordinary and necessary expenses" under section 234 (a) (1), 40 Stat. 1077. A "personal service corporation" is one "whose income is to be ascribed primarily to the activities of the * * * stockholders who are themselves regularly engaged in the active conduct" of its affairs "and in which capital (whether invested or borrowed) is not a material income-producing factor."

It is probably true, as Judge Westenhaver said in Fuller & Smith v. Routzahn (D. C.) 23 F.(2d) 959, 965, that the gross

distinction which Congress had in mind was between manufacturing or mercantile companies and those who got their income from doing services for the public. "Primarily" in that sense might mean no more than that the greater part of the business was not in things made and sold. However, it is entirely clear that this is too broad a division and that the exemption was more straitly limited. The intent was not to include all such companies, but of them only those in which the shareholders personally produced the greater part of the income. Even so, the section is still not clear, for it is impossible to say whether the income of a business in which a number take part is to be "primarily ascribed" to one or to another. Quantity presupposes some identity of the units counted, and the shares of those who take part in a business are not alike. Each is necessary, but there is no common measure. In spite of this we do say roughly that the income of an author for instance is primarily his own, though he employ a stenographer and a printer, without whom he could not realize anything at all. No doubt in doing so we have recourse unconsciously to other than quantitative tests, perhaps relying upon the relative esteem in which we hold the several activities which coalesce in the work. In laying down so loose a test Congress must be understood as requiring its naive application, not as referring to standards which can be ascertained by reference. The law is largely made up of such commands, as indeed it must be if it is to be couched in colloquial language.

It seems to us that the record at bar shows a situation in which the work of the shareholders was not the primary source of the income. Without them it is quite true that the activities of their employees would have been futile, but that is true wherever supervision and direction are essential, as they always are. To run a theatre it is necessary to keep it in repair, to light and heat it, to hire the necessary attendants, shifting the scenery, selling tickets, showing playgoers to their seats, keeping it clean and ventilated. We think of nothing more which makes up the sum of the necessary activities, and none of these things the shareholders did. They kept an eye out that all should go well, much as the executives of any other business who take no part but that in what goes on. While the income is certainly due to them as much as to the rest, we do not believe that most people would consider them the primary source of the resulting profits.

On the whole the courts have taken this view. In Metropolitan Business College v.

Blair, 24 F.(2d) 176 (C. C. A. 7), the company managed a business college, employing some fifty-four teachers in thirteen separate schools. These the shareholders supervised and the president, who owned four-fifths of the shares, controlled the policies, methods and courses of study. It seems plain that the income was not "primarily" due to the executives, and it is hard to reconcile Strayer's Business College v. Commissioner, 35 F.(2d) 426 (C. C. A. 4), where the teachers were twenty or more, distributed among two schools. To be sure there was a difference in degree, and often that is enough, but being forced to a choice, especially when dealing with a statute exempting taxpayers, we accept the earlier decision. The Seventh circuit reached an opposite result in North American Ry. Construction Co. v. Com'r (C. C. A.) 27 F.(2d) 493, 59 A. L. R. 1274, in a case involving the maintenance and renewal of a railway under a contract with the road. It does indeed appear at first blush as though the chief work was not that of the shareholders, but the court relied upon the peculiar features of the contract by which the railway furnished all materials and labor, and the company merely directed the work. The shareholders did, or were found to do, only work of supervision and this accounts for the result. Cuyahoga, etc., Co. v. Com'r, 58 App. D. C. 248, 29 F.(2d) 448, and St. Paul Abstract Co. v. Com'r, 32 F.(2d) 225 (C. C. A. 8), both concerned title abstracting companies; in each the taxpayer lost. The shareholders again did all the supervision, but a corps of clerks, abstractors and the like drew off the documents from the records and prepared the actual abstracts of title. In Atlantic Coast Distributors v. Com'r, 33 F.(2d) 733 (C. C. A. 4), the company sold packing boxes to farmers. These it bought from manufacturers, who shipped them direct to customers. The two shareholders who managed the business, employed clerks, stenographers and four employees, whose duties do not appear except that one was a shipping clerk. The business must, we should suppose, have been substantially all done by correspondence; if so, the assistants were merely clerical. Under such circumstances it might well be held, as it was, that the primary source of income was the shareholders themselves. Insurance brokerage, in spite of the employment of sub-agents to get business, and of clerks, stenographers and the like, was held to be within the section, in Kaufman v. Com'r, 24 F.(2d) 44 (C. C. A. 4), and Hurst v. Heiner (D. C.) 26 F.(2d) 734. The question in such a case appears to us to depend upon the proportion of the insurance underwritten by each class. So far as we can understand the reasoning, the courts took a broader view than we should have been disposed to. An advertising agency is in the same category. Fuller & Smith v. Routzahn (D. C.) 23 F.(2d) 959. These, we think, include the only cases in the Courts of Appeal, though there are several others decided by the District Courts and the Board, which we need not discuss.

As might be expected, the result is not altogether harmonious, but nothing has been settled which need forbid our accepting article 1528 of Regulations 45 as a reasonable gloss upon the text of the section. Even so, much remains to be desired by way of definition. It is for example difficult to know when the "experience and skill" of the shareholders contribute the "value" to the employees' work; such language hardly does more than restate the problem. Perhaps we can do no better than to repeat that in the case at bar the share of the shareholders was no more than supervision, and that this is not ordinarily enough; at least when supervision cannot itself be said to be a part of the end product itself, that is, of the service rendered.

We find it unnecessary therefore to decide whether the company had capital which was a "material income-producing factor." The lease was the kernel of the enterprise. Perhaps it had no value, but that can scarcely matter. If the term had been bought outright with borrowed money, we assume that no one would question its being borrowed capital. While the rent was paid out of the earnings, we should hesitate to hold that the term itself, a chattel real, was for this reason not part of the company's capital. It was not like an office; rather it was the very thing, whose use was made available to customers and for which they paid.

As to the claim that the supposed salaries were ordinary and necessary expenses of the business, we have little to say. The resolution of 1923 was confessedly an afterthought passed to meet the Commissioner's refusal to give the company the status of a personal service company which it claimed. This is indeed not conclusive, but the Board has quite naturally used it as evidence that the salaries were not "paid or incurred" some three years earlier. We should certainly not be justified in saying that it was unreasonable to conclude that in 1920 the shareholders meant to leave the return for their services to their profits from the business. Indeed, even the form of the resolution makes it clear that the money

was not finally appropriated. The salaries were to remain in the treasury for such use as the directors should later decide. This is not consistent with final allocation; the corporation did not recognize any absolute obligation, even retroactively.

Decision affirmed.