## NORTH AMERICAN RY. CONST. CO. v. COMMISSIONER OF INTERNAL REVENUE.

Circuit Court of Appeals, Seventh Circuit.
July 6, 1928.

No. 3995.

Internal revenue ⬤⟿7(28), 9(27)—Corporation engaged in maintaining and renewing railroad roadbeds under contract held, in view of facts, "personal service corporation," within Revenue Act (Revenue Act 1918, § 200 [Comp. St. § 6336⅛a]).

Corporation having contracts with railroads for maintenance and renewal of roadbeds, ties, etc., on a straight contract or cost plus basis, *held* primarily engaged as engineer and organizer and superintendent, in view of facts, and "personal service corporation," within meaning of Revenue Act 1918, § 200 (Comp. St. § 6336⅛a).

Petition by the North American Railway Construction Company for review of order of the United States Board of Tax Appeals, opposed by Commissioner of Internal Revenue. Order of Board of Tax Appeals reversed, and cause remanded, with directions.

There is involved an alleged deficiency of $40,127.62 in petitioner's federal income and profits tax for 1918, arising from respondent's refusal to classify petitioner as a "personal service corporation" under section 200 of the Revenue Act of 1918. The record facts appear only from the findings of fact of the Board of Tax Appeals, which are concededly correct, and the issue is upon the Board's conclusion thereon, which was in favor of respondent.

Petitioner, an Illinois corporation, was organized in 1898, and it long carried on the business of building railroads and similar large construction work. At the beginning of 1918 its capital stock was $60,000, which was about that time increased to $100,000, and in April of that year to $250,000, of which all but $50,000 was issued. Its three principal stockholders, holding about 85 per cent. of the outstanding stock, were actively and regularly engaged in the business of the company; the president receiving a salary of $20,000, and the others lesser amounts.

In July, 1917, petitioner entered into a contract with the Baltimore & Ohio Railroad, whereby petitioner agreed for one year to perform for the railroad such work as maintenance and renewal of roadbed, ties, rails, and ballast, aligning and surfacing tracks, ditching, weeding, and cleaning roadbed, installing additional yards and tracks, and other work, all as the railroad might require. It was provided that the railroad supply all tools, materials, work train equipment, and

service; that petitioner employ, organize, and have immediate supervision of all necessary laborers, superintendents, foremen, timekeepers, etc.; that all the work be done under general direction of the railroad's engineer, who shall designate the place and nature of the work, and specify the number of men to be employed at various locations, and on his request petitioner to discharge any employees; that petitioner keep books, and give engineer daily report of labor performed each day, and each month petitioner deliver to railroad complete statement showing labor, materials, etc.—railroad to keep its representative at the work to check and to approve pay rolls and material invoices; railroad to transport, free, petitioner's superintendents and timekeepers; petitioner to pay transportation of laborers, which railroad will each month refund to petitioner; petitioner to procure, at railroad's expense, accident insurance acceptable to railroad against liability for death or injury to employees; railroad to pay actual cost of all wages, and for materials, supplies, and tools used, such materials and tools, from time of arrival, to be property of railroad. Beyond paying such actual cost, the railroad to pay petitioner for its service 12 per cent. of such cost; petitioner to make no charge on account of its own general office expense. Contract to be in force one year, with right of railroad to cancel on 30 days' notice.

Work under the contract began about July 15, 1917, and for the year 1918 petitioner's principal business was the execution of this contract and its renewal, and for this the railroad paid petitioner during 1918 $1,234,797 (usually in semi-monthly payments on bills rendered), of which $1,006,346 was for pay roll, $145,513 for the percentage compensation of petitioner, and the balance for Pittsburgh office expense, transportation, tools, materials, loss on commissary, advertising, fitting up work camps, etc. During same year petitioner had contracts with a few other concerns on similar work, some straight price contracts, and others "cost plus" contracts similar to those with the Baltimore & Ohio. For the year the company's net income from all the work was $136,822.43, whereof $116,445.86 was from the "cost plus" contracts, and $20,366.57 from straight contract price work.

Petitioner's average invested capital during 1918 was $75,000, of which from $6,000 to $10,000 was in tools, machinery, and equipment, $20,000 cash, and $44,850 in various stocks and bonds. Its income from the investments was $3,872.14. During the year

petitioner's president, on his own credit, borrowed money from time to time to meet pay rolls, necessitated wholly or in part by failure of the railroad to make prompt payments, a condition which was remedied after complaint to the railroad. The loans averaged something over $37,000 a month while executing these contracts, and petitioner paid interest of $3,200.41 on such loans, which the railroad did not pay.

In performing the contract there were employed many superintendents, foremen, timekeepers, office men, and artisans of different kinds, and over 3,300 laborers, and camps, commissaries, and employment agencies were maintained, the cost of all of which was paid by the railroad. Petitioner's own general office, maintained at its expense was in Chicago, where the employees were one stenographer, one full-time and one part-time bookkeeper, and an office boy.

The railroad had previously done this work without such an intermediary, and its stated reason for making the contract was the disorganization of its forces through the exigencies of the war, and the great difficulty in maintaining a suitable force to superintend and direct the work and keep up the supply of laborers, who, at that period, were attracted to other fields, particularly government work, and it desired to have the benefit of petitioner's organization, and the long and well-known experience of its officers in organizing, engineering, and executing such work.

The Board of Tax Appeals reached the conclusion that the company was not a personal service corporation, within the meaning of the law, and sustained the tax which had been determined by respondent Commissioner upon the same theory.

Harry Eugene Kelly, of Chicago, Ill., for petitioner.

John V. Groner, of Norfolk, Va., for respondent.

Before ALSCHULER, PAGE, and ANDERSON, Circuit Judges.

ALSCHULER, Circuit Judge (after stating the facts as above). Section 200 of the Revenue Act of 1918 (Comp. St. § 6336⅛a) defines the term "personal service corporation" as "a corporation whose income is to be ascribed primarily to the activities of the principal owners or stockholders who are themselves regularly engaged in the active conduct of the affairs of the corporation and in which capital (whether invested or borrowed) is not a material income-producing fac-

tor." That petitioner's principal stockholders were, during the year 1918, "themselves regularly engaged in the active conduct of the affairs of the corporation" is clearly apparent and is undisputed. To entitle petitioner to the classification for which it contends, two further statutory conditions must coincide, viz.: (1) That the income for the year is to be ascribed primarily to the activities of the principal stockholders; and (2) That capital, invested or borrowed, was not a material income producing factor.

It is urged for respondent that, conceding the activities of these principal stockholders in the organization and superintendence of the working forces and the direction of their efforts, the income is not primarily to be ascribed to these activities, but rather to those of the thousands of their employees in the conduct of this work—the many superintendents, foremen and accountants at the work, and the laborers, who were indispensable to its execution. If all these employees can be said to have been in fact petitioner's employees, with the incidents ordinarily attaching to such employment and relation, such condition might require this proposition to be determined favorably to respondent.

In Metropolitan Business College v. Blair (C. C. A.) 24 F. (2d) 176, that situation was presented. There the corporation employed a large corps of teachers, in its various schools in Chicago and elsewhere, who came directly in contact with the student body, whose tuition was the main source of the corporate income. We held that under such circumstances it would not follow that the income was ascribable primarily to the principal stockholders of the corporation, who employed the teachers and planned their work, but rather to this large body of its responsible employees.

In the instant case the fact that as between petitioner and these employees there existed an ostensible relationship of employer and employee is not necessarily controlling. The facts must determine the actual relation. Petitioner could employ persons only in such numbers and at such places as the railroad directed; and it was within the power of the railroad to move them about, order them discharged, and practically do any and all those things respecting them which it might have done were it the employer, and which it did before this relation with petitioner existed. It fixed their rate of pay, and paid for indemnity against employers' liability, and such of their men as objected to the change of employer because they feared loss of benefits under the railroad's employees relief depart-

ment were assured that their relation therewith would continue as before. Wages and salaries of the entire force, as they accrued, were to be met by the railroad. It paid their transportation, the expense of their work camps, and at its expense all materials, appliances, and tools were provided, which at once became its property. The railroad, in fact, retained complete domination over the work to be done and of the force which was to do it; petitioner's function being that of engineer, and of organizer and superintendent.

For assuming this ostensible relation of employer, and organizing and superintending the working force, so far as the railroad might permit, petitioner was to receive 12 per cent. of the actual amount which the railroad expended for the work and materials. Perhaps petitioner's brief-writer is not far from the truth in the statement that "manifestly they were carried on the so-called 'pay roll' of the petitioner only as a make-believe, to help the railroad company in its preservation of its wage scale for the future."

But, whatever may have been the motive for what counsel further describes as the fiction of publicly calling them petitioner's employees, we are satisfied that, for the purpose of this inquiry, this force of men must be regarded as though they were, at all the time in question, employees of the railroad, and that petitioner was engaged by the railroad as an agency, to bring to this work its engineering and managerial skill, acquired through many years of experience in such work, and that it was petitioner's principal stockholders who devoted their time, energy, and skill to this service, which earned for petitioner during that year the great bulk of its net income. It may therefore be fairly concluded that its income, so far as attributable to these matters, "is to be ascribed primarily to the activities of the principal owners or stockholders."

The relation of petitioner's other income for the year is considered in what follows. Was capital a material income producing factor? For the government it is urged that petitioner's capital stock was $200,000, and that its invested capital for the year was $75,-000, and that in its business it had acquired tools and equipment of considerable value. Granting this, did these contribute materially to petitioner's income for 1918? So far as the "cost plus" work for 1918 is concerned, there was no occasion to use any of petitioner's equipment. Everything of this nature was supplied and owned by the railroad, and it is plain that none of petitioner's equipment

contributed to the profit on these activities. In this respect, also, the case differs from Metropolitan Business College, supra, in that in the latter a large amount of capital was represented by equipment and plant, which we held to have been a material income producing factor.

But it is urged for respondent that petitioner paid $3,200 interest on money borrowed in 1918 to carry the pay rolls, when the railroad did not make payment in sufficient time to avoid delay in paying the men, which involved an average monthly borrowing of about $37,000. It does not appear to have been any part of petitioner's duty to make these payments in advance of receiving the money from the railroad; but evidently it was deemed good policy to do so, in order that the men would not be kept waiting for their pay, and it appears that petitioner's president from time to time advanced the money, when the railroad did not pay in sufficient time. We do not think that this occasional, brief, and incidental carrying of the pay roll, without obligation to do so, should be considered in the light of "borrowed capital," or that in any way it was a material income producing factor within the meaning of the statute.

But it does appear that petitioner had for that year some income apart from such as was derived from the so-called "cost plus" work. Petitioner's net income for the year, from all sources, was $140,814.57, of which $116,455.86 was for the "cost plus" work, $20,366.57 for straight contract work, $120 from rents, and $3,872.14 from investments. While there would be no difficulty in concluding that the $3,992 of income derived from investments and rent should not be considered as "material" in comparison with the total net income of $140,814.57, we are not prepared to say that, if the $20,366 of profits on the straight price work were added, the $24,358 total could be likewise regarded as not "materially" contributing to the net income for the year.

The only finding of the board with reference to the relation of the parties upon the work other than that governed by the contract, is in these words: "During 1918 the petitioner had other contracts with the Baltimore & Ohio Railroad, The Cincinnati, Hamilton & Dayton Railway Company, and the Interurban Railway Company of Des Moines, on both the cost plus basis and the straight contracts price basis. These contracts provided in substance, but in varying terms, for the laying and grading of tracks, the making of excavations, the erection and construction

of various kinds of buildings and railroad appurtenances, the furnishing of labor, and similar items. The net income from all contracts was $136,822.43, of which $116,455.86 was derived from cost plus contracts and $20,366.57 from straight contract price agreements."

Being clearly of the opinion that the vast bulk of its activities for 1918 would for that period bring petitioner fairly within the statutory classification of a personal service corporation, we do not believe that, as to this comparatively small contribution to the total of its operations and net profit for the year, petitioner's relation to the work which it involved is, from the facts as found, sufficiently distinguished therefrom as to require petitioner on that account to be barred from such classification. Under the circumstances here present, we are of opinion that for the year in question petitioner's relation toward its work and its income was such as to entitle it to classification as. a personal service corporation.

The order of the Board of Tax Appeals is accordingly reversed, and the cause is remanded to the Board, with direction to determine petitioner's tax for the year 1918 upon the basis that for such year petitioner was a personal service corporation.