**ALEXANDER, CONOVER & MARTIN, Inc., v. COMMISSIONER OF INTERNAL REVENUE.**

**No. 4376.**

Circuit Court of Appeals, Seventh Circuit.

Dec. 18, 1930.

* *

J. S. Boyd, Edmund D. Adcock and Irvin H. Fathchild, all of Chicago, Ill., for petitioner.

G. A. Youngquist, Asst. Atty. Gen., and Sewall Key and John McEvers, Sp. Assts. to Atty. Gen. (C. M. Charest, Gen. Counsel, Bureau of Internal Revenue and Robert L. Williams, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., of counsel), for respondent.

Before ALSCHULER and EVANS, Circuit Judges, and LINDLEY, District Judge.

LINDLEY, District Judge.

Petitioner seeks a review of a decision of the United States Board of Tax Appeals wherein that body approved additional assessments of corporate income and profits taxes for the year 1920 and 1921 of $7,120.-21 and $2,351.03, respectively, upon the basic proposition that during the years in question petitioner was not a personal service corporation within the meaning of that term as used in the Revenue Act. If the Board was wrong in its conclusion in that respect, the additional assessments cannot stand.

Section 200 of the Revenue Acts of 1918 and 1921 (40 Stat. 1058, 42 Stat. 228) provides that "the term 'personal service corporation' means a corporation whose income is to be ascribed primarily to the activities of the principal owners or stockholders who are themselves regularly engaged in the active conduct of the affairs of the corporation and in which capital (whether invested or borrowed) is not a material income-producing factor; but does not include * * * any corporation 50 per centum or more of whose gross income consists either (1) of gains, profits or income derived from trading as a principal. * * * *"

During 1920 and 1921 the capital stock of petitioner, an Illinois corporation, was held by ten stockholders, nine of whom were regularly engaged in the active conduct of the corporation's business, devoting their entire time thereto. Each of these, except the cashier and office manager, was a member of the Chicago Live Stock Exchange. The tenth shareholder was the wife of the principal stockholder and devoted no time to the company's affairs. She owned less than 10 per cent. of the stock. Petitioner's sole business was buying and selling live stock for a scattered clientele upon a commission basis. Each of the stockholders, eliminating the cashier and office manager and Mrs. Conover, gave his personal attention to from 500 to 1,000 shippers, attended to the business of all the persons within his group and kept constantly in touch with them, advising as to matters of policy in purchasing, feeding, and selling, supplementing such personal service with weekly market reports, prepared by members of the firm and mailed to the entire clientele. These stockholders, at irregular intervals, traveled among their respective clients in the country, thus keeping in personal touch with them.

Live stock was consigned to petitioner at Union Stockyards in Chicago or the branch office in Kansas City. Upon its arrival, the stockyards company unloaded the cars, placed the stock in the pens assigned to petitioner, and furnished the necessary feed, charges for which were billed to the customers in care of petitioner. The latter in turn deducted the amount of these bills from the proceeds of sale before remitting to its customers. Upon arrival, the stock was graded by the members of the firm and then sold at auction for the owners. Various employees who were not stockholders assisted in this work as yardmen and assistant sellers. Under the direction of the stockholders they helped sort and grade the stock, but, as the Board of Tax Appeals observed, the duties of the assistants "were to assort and watch the stock and to assist the various stockholders." On days of unusually large receipts, they sold part of the stock at prices suggested by the stockholders. But all these services were rendered under the direction and supervision of the stockholders. The yardmen, stenographers, and office workers performed manual labor or routine clerical duties.

One assistant buyer received a salary of $10,000, but he also participated in the profits of the corporation, and the other assistant salesmen were paid approximately $4,000 per year.

Petitioner did no trading upon its own account. Its profits consisted of commissions, plus a small amount of interest on Liberty bonds purchased during the war. Of its gross income of $300,000 in 1921 and somewhat less in 1920, all but $2,641.80 in 1921 and $731.51 in 1920 was from commissions. Its invested capital totaled $63,000 in 1920 and $66,000 in 1921, and consisted of office furniture and fixtures, $12,000, Stock Exchange memberships of approximately $20,000, Liberty bonds and miscellaneous assets. It bought and sold for others in each of the years over $40,000,000 of live stock. Only in a few instances, consisting of less than one-half of 1 per cent. of the total, did petitioner finance loans for its clients, and then only by indorsing the latter's otherwise secured note. The persons thus accommodated constituted only 30 out of 18,000 customers.

In this situation we are of the opinion that petitioner's income is to be ascribed primarily to the activities of the principal stockholders, regularly engaged in the active conduct of the corporate affairs, that capital was not a material income-producing factor in the earned income and that none of its profits were derived from trading as a principal. The findings of fact of the Board do not negative this conclusion, though in its opinion that body stated that it could not conclude that "the income of the petitioner is to be ascribed primarily to the activities of the principal stockholders," and concluded that capital was a material income-producing factor.

In H. K. McCann, Inc., v. Commissioner, 14 B. T. A. 234, the Board said: "There is a point beyond which the services of employees may not be used without creating an organization which overshadows its supervisors in producing income, or so materially assists that income can no longer be said to be produced primarily by those who originate the business and supervise its execution. Whether that point has been reached must be decided in each case upon the facts in such case. * * * Where, as here, employees function only under the direction of the stockholders who are the active creative force in the business and whose judgment and planning are the foundation of the service rendered; where the service for each client is performed according to an original plan created by the stockholders who give their personal attention to the carrying out of the service, the presence of employees who assist in the execution of the plan does not negative the primary function of the stockholders in the production of income. Westermann & Pagano, Inc., 2 B. T. A. 1308; Moser & Wacker, Inc., 4 B. T. A. 1021; S. A. Conover Co., 6 B. T. A. 679; Fuller & Smith v. Routzahn [D. C.] 23 F.(2d) 959."

Here all income-producing activities, requiring the exercise of discretion, were performed by the principal stockholders or under their personal supervision and direction. Though a greater total of salaries was paid to nonstockholder employees, that fact does not in any way detract from the proposition that the revenue-producing power was the skill, experience, executive ability, and personal service of the principal stockholders. It is not strange that vast sums were paid to employees to perform the manual-labor of handling $40,000,000 worth of livestock and to assist the members in achieving the results of their creative ideas. As this court said in North American Ry. Construction Co. v. Commissioner, 27 F.(2d) 493, 495, 59 A. L. R. 1274, though the number and wages of artisans, laborers, and superintendents were great, what the corporation desired in order to realize earning power was "to bring to this work its engineering and managerial skill, acquired through many years of experience in such work, and that it was petitioner's principal stockholders who devoted their time, energy, and skill to this service, which earned for petitioner during that year the great bulk of its net income. It may therefore be fairly concluded that its income, so far as attributable to these matters, 'is to be ascribed primarily to the activities of the principal owners or stockholders.' "

As to the contention that capital was a material income-producing factor, it is to be observed that wages and salaries were paid entirely from earnings; that accounts receivable and payable represented only moneys received for and to be remitted to clients and incidental debits and credits, in no wise representing capital; that the advertising cost represented the cost of the weekly market letter of advice to customers; that the assistance to customers constituted thirty instances out of 18,000 and less than one-half of 1 per cent. in volume; that even in such instances the bank loaned direct to the client, upon the security of a chattel mortgage, and that petitioner indorsed only after such security had been taken.

Money paid for wages from income is

not capital. North American Ry. Construction Co. v. Commissioner, 27 F.(2d) 493, 59 A. L. R. 1274. "Invested capital was not a material income-producing factor, if it was used solely as a fund from which to advance salaries, wages, etc., and to provide office furniture, accommodations, etc. Iredell v. DeLaski (C. C. A.) 290 F. 955; Hubbard-Ragsdale v. Dean (D. C.) 15 F.(2d) 410; Mountain View Sanitarium v. Huntley (District Court, Oregon) 25 F.(2d) 1016; Fuller & Smith v. Routzahn (District Court, Eastern Division of Northern District of Ohio) 23 F.(2d) 959." Hurst, Anthony & Watkins, Inc., v. Heiner (D. C.) 26 F.(2d) 734, 736.

The facts do not warrant the conclusion that the petitioner was not a personal service corporation. Accordingly the order of the Board of Tax Appeals is reversed.