PARK AMUSEMENT CO. v. McCAUGHN,
Collector of Internal Revenue.

(District Court, E. D. Pennsylvania. December 31, 1925.)

No. 10310.

1. Internal revenue ⬤⇒9(27)—Test for determining whether corporation has merely nominal capital, within excess profits tax law, is whether money as income producer played substantial part in producing income to be taxed (Revenue Act 1917, § 209 [Comp. St. § 6336⅜j]).

Under Revenue Act 1917, § 209 (Comp. St. § 6336⅜j), imposing an excess profits tax at a flat rate of 8 per cent. on the income of corporations "having no invested capital or not more than a nominal capital," and at a graduated rate on other corporations, the criterion for determining whether a corporation has not more than a nominal capital is in the question of fact whether money as an income producer played any real and substantial part in producing the income to be taxed.

2. Internal revenue ⬤⇒9(27)—Corporation held to have only nominal capital, and subject to tax of 8 per cent. on its net income (Revenue Act 1917, § 209 [Comp. St. § 6336⅜j]).

Plaintiff corporation was organized to conduct an amusement park. It had a capital stock of $2,000, to comply with the incorporation law of the state; but its financial plan was that the business itself should supply the money necessary to conduct it, expenses being met from receipts, and the excess being its net income, which for the fiscal year in question amounted to $30,000, to produce which expenditures from receipts of about $150,000, was required. Held, that such expenditure did not constitute invested capital, but that, within the meaning of Revenue Act 1917, § 209 (Comp. St. § 6336⅜j), the corporation had no more than a nominal capital and was subject to excess profits tax thereunder at the flat rate of 8 per cent.

At Law. Action by the Park Amusement Company against Blakeley D. McCaughn, Collector of Internal Revenue. On rule for new trial. Rule discharged, and judgment entered for plaintiff.

A. S. Arnold, of Philadelphia, Pa., for plaintiff.

George W. Coles, U. S. Atty., of Philadelphia, Pa., and F. F. Toomey, of Washington, D. C., for defendant.

Before THOMPSON and DICKINSON, District Judges.

DICKINSON, District Judge. This cause concerns itself with the construction of the revenue statute of 1917, and more particularly section 209 (Comp. St. § 6336⅜j). The pertinent features of the act are that it imposes a flat rate tax of 8 per cent. upon all corporations which have "no invested capital or not more than a nominal capital," and a graduated scale rate upon others. The case is heard in the form of a rule for a new trial, but really as a case stated, the facts not being in controversy, and a verdict having been perfunctorily directed as one way of raising the question of law presented, under the stipulation that the court may enter judgment on the verdict, if of opinion that the law is with the plaintiff, or otherwise grant a new trial.

Disregarding the formalities, the plaintiff contends for a flat rate; the United States, for a graduated scale rate. The subject has been dealt with by Congress in a number of revenue acts, in each of which the general scheme of taxation applied is the same. They differ only in the definition of the class of taxpayers who pay the flat rate. A very helpful aid, if not the best guide, to the construction of a statute, is to follow the Blackstonian suggestion to consider the conditions as they were unaffected by the law; the evil therein which was thought to call for a remedy, and the remedy devised to be applied.

The first feature of this suggestion leads to some discursive comments. The subject of the law is primarily income. Under the conditions before prevailing, they were treated with equality, paying ratably the same tax, graded only according to size. Evil was thought to lurk in this kind of equality, and that incomes should be classified on a different basis than that of size alone. Whether this departure from the principle of equality is economically sound or wise, or consonant with sound political principles, is beside the mark. We are to learn only what the principle of classification of incomes is in which the departure consists. Income, profits, gains, earnings, and equivalent words all carry the thought of yield, fruits, usufruct, and, in order to make them measurable, are treated as an annual increment in money, mediately or immediately, actually or potentially. Commercialism so dominates us that we cannot think of values and gains otherwise than in terms of money, nor express our thoughts except in monetary phrases. Money breeds money, and when put at work, as when it is what is called "invested," it produces a yield which is looked upon as wholly without the contribution of human service.

There is likewise another form of "income," or emphatically "earnings," which is the product of what the later acts quite happily call "personal service." The thought was to differentiate between these two kinds of "income," and to favor the second class by subjecting it to a less onerous rate, or, perhaps, which has the same result, to subject incomes of the first class to a heavier, and, if the income is large, an almost punitive rate. This tax is given a name which is significant. It is an "excess profit" tax, and is imposed when the gain derived is deemed to have been abnormal or inordinate. Profits derived as the earnings of personal service, however large, were not deemed to be "excessive." Although taxpayers were thus divided into two classes, it was recognized that there was in fact a third class. This was made up of those who belonged in strictness to neither, because they partook in varying degrees of both. It thus became necessary to assign the numbers of this third class more or less arbitrarily to the first class or the second. We have thus the "old law," the supposed "mischief," and the proposed "remedy," and it only remained to devise the form which this remedy was to take and to apply it.

Here we have use for another canon of construction. The devising of remedies of this kind is wholly a legislative function. The courts, by having regard solely to the motive for an enactment, cannot, under the guise of repressing the evil and advancing the remedy, rewrite the enactment, in order to make the remedy more effective. The remedy as devised and as provided by the statute must be applied, however ineffective it may be. The courts may so construe the language of a statute as to give to the remedy all the effectiveness of which it is capable, but they cannot substitute for it another, no matter how much more effective the substitute might be. The broad classification of

incomes which the statute contemplates is clear enough. Common speech affords us an illustration. One man is said "to live upon his income." What is meant is that it is not the fruit of any efforts of his own. The yield is due solely to the fertility of his "investments." Another man is said "to earn his living." He has no fructified money accumulations. In size these two incomes may be alike, because equal; but in source they are wholly different.

We have many concepts of things which, in a general view, or when considered in what may be called the mass, present a contrast so sharp and well defined that one may be regarded as the very antithesis of the other, and yet on nearer approach, and when we descend from the general to the particular, from the abstract and theoretical to the concrete and practical, they are found to fade into each other so gradually and imperceptibly that it is impossible to determine where one begins and the other ends. When we wish to place two things in the strongest contrast, and to emphasize the difference between them, we say they are as different as day and night, and yet the truth is that, although at high noon or at midnight we may speak thus confidently of day and night, we cannot do so in the gloaming.

Just this difficulty confronted Congress in defining these two classes of taxpayers, and in assigning those who belonged to both to one or the other. The key word employed by Congress is "capital." It was used because our language supplies no other to express the thought in mind. All laws, and emphatically tax laws, which tell the individual what he is to do, should have their language interpreted in terms of common speech, unless the act shows that the words are employed in some other sense. There is, perhaps, no other word in our tongue which is more used, used in more different senses, and more ill used, than this word "capital." Changing conditions affect the use of words, as they do other things. When simplicity was a characteristic of living conditions, individual, social, and business, this word had a well-defined meaning in its practical application to business affairs. Now that complexity has overwhelmed and well-nigh strangled and smothered us, the word has lost certainty in its practical use.

Perhaps no better illustration of what was meant by capital could be found than in the original concept and the practical workings of a bank of discount. It had to have a capital, as the thought was that a banking business could not be conducted without it, and it could not be a strong bank, unless this capital was large. It was unthought of, and would have been deemed unthinkable, that the skill and command of public confidence of its managers might form its real capital, supplemented by the money of its depositors, and that a capital in the former sense of that term was wholly unnecessary, and that, if there was such capital, its contribution to the earnings of the bank would be negligible. Yet the truth is that this very change has largely come about, and, as has been said, just as we have wireless telegraphy and fireless cookers, so we have capital-less banks, of which building associations of a few years back and savings fund banks are literal examples, and indeed the real money capital of all banks of deposit is supplied to-day by their depositors, rather than by their stockholders.

The change in the opposite direction is just as marked. A few years ago the medical and legal professions would have supplied us with perhaps the best illustrations of incomes toward which capital, in the accepted sense of that term, made no contribution. A few instruments and a few books, with some office furniture, might have been regarded in the economic sense as "invested capital"; but this capital was so negligible that the practically minded would have ignored its existence. To-day the organization and equipment of a lawyer's or doctor's office represents, in our larger cities at least, a very substantial investment, and the plant capital investment of our "dental parlors" vies with that of a steel mill.

Business, as well as Congress, has been on the quest of finding a line of demarcation between these two kinds of "earnings," and determining what proportion of the common yield flows from each. How should the profits of an industrial plant, or any other business activity, be apportioned among labor, management, and capital? The only definite practical result we have in mind, which was ever reached on land, was in agriculture, when one man contributed capital in the form of land, stock, and agricultural implements, and another tilled the land and managed the farm. There the factors in the yield (aside from what Providence through nature gave) was this capital and this labor, and the yield was divided accordingly. This was called "farming on shares." Fishermen have put into practice the same general plan of apportioned gains.

[1] This was essentially the problem before Congress, and, as has been said, it has several times attempted a solution. The one

with which we are now concerned is that of 1917. It has two thoughts, which in practical working come down to one. The first was to define the class as made up of those to whose activities through which the income came there was no aid given by "invested capital." It was at once recognized that this, in many cases, if not all, would have no practical meaning, because there would be no case in which it could be truthfully averred that there was absolutely no capital employed. This condition was met by the alternative phrase, "not more than a nominal capital." That is nominal which has existence in name, but no actual, substantial existence. Capital is used here in the sense of what is commonly called moneyed capital, although, of course, it includes many things which are not called money as an excluding term. A contribution of land to capital is as much capital as is a contribution of "coin of the realm," which is afterwards invested in land, and is as much capital, whether the use of the land is enjoyed through an ownership in fee, or for life, or for years. All this is clear enough, but it does not help us much. The real criterion is in the fact finding of whether money as an income producer played any real and substantial part in producing the income to be taxed. Each tub must thus stand on its own bottom, and the sole question becomes how the fact stands here.

[2] The business in the instant case is that of one form of the show business. This suggests the human service element and factor. Money may talk, but it cannot act in the stage artist sense, although, of course, it may command such services. The financial scheme or fiscal plan of the venture was that it should itself supply the money necessary to conduct it. This was planned to be accomplished by all expenditures being met, weekly or otherwise, out of the box office receipts, and this plan has worked out satisfactorily and has been followed.

The plaintiff is a corporation, and to be incorporated it was obliged to comply with the law of its incorporation. One requirement was that it should have a capital of not less than $2,000, divided into shares and paid into the treasury of the company. The plaintiff perforce complied with this, among other, requirements of the law, and fixed its capital at the minimum sum required. Box office receipts fluctuate more or less widely from time to time, so that the receipts from the business during one period would be no index of what they would be the next. The management in consequence adopted the policy of not making distribution of all which

was in hand at the time, but held back from time to time a sum which we will call $5,000. It at no time exceeded $7,000 or $8,000. The net earnings or profits of the business were quite substantial, and may be deemed to be measured for each fiscal period by the sum of $30,000.

The plaintiff admitted its obligation to pay the lighter rate of taxation imposed, which, to present the fact situation, we will call $3,817.16. The taxing officers ruled that it was subjected to the higher rate, and at first assessed the tax to be paid at $11,239.42, but afterwards voluntarily and of their own motion reduced it to $5,598.09, so that the sum now in controversy is represented by the verdict.

These are the salient features of the fact situation. A number of ultimate fact deductions or inferences may be drawn from these evidentiary facts. One is that, in the economic sense, this plaintiff has capital, which is employed and may be said to be invested in the business venture from which this taxable income flows. By just what figures this capital would accurately be expressed in monetary terms is a matter of opinion, and respecting which opinions might well widely differ. Another is that, in the commonly accepted sense in which the word "capital" is used and employed in respect to the organization and business of a corporation, it has a capital stock of $2,000, and might be said to have an actual business capital of possibly as much as $10,000, or even more. Another, and the controlling, fact is that, in the sense in which the words are employed in the Revenue Act of 1917, the plaintiff has "no invested capital," or, if it can be said to have a capital of any kind, it is "no more than nominal."

This latter finding is induced by another, which is that "moneyed capital," as that phrase is commonly understood, is the kind of capital which the act contemplates, and that no such capital contributed to the income of the plaintiff, or, if it did, the contribution was only incidental and nominal, because negligible. Congress has defined the meaning of "invested capital," as those words are used in the act, and to that meaning we are tied, whatever other meaning might otherwise be given to the phrase. It is doubtless true that the definition was given by Congress because it had in mind a different purpose than that of affecting the situation now presented; but this does not change the fact that the definition is there, and forbids us to take a definition from a work on politico-economics.

It has been pressed upon us that the

plaintiff had an invested capital of approximately $150,000, because it required total receipts of nearly $180,000 to produce profits of about $30,000, or rather because the expenditure of $150,000 was required to produce gross receipt of $180,000. We are not sure that we quite grasp just what is meant by this. The words of the brief are, "It was not only expedient, but absolutely necessary, to use $148,244.46 of *actual working capital*," and these figures are reached because the plaintiff "was required to and did expend" in the taxable year a "grand total of $148,244.46." These figures are correct, as those of the "turn-over" of the business as far as affects expenditures; but the taking of them as the measure of the "actual working capital" was perhaps an inadvertence, because, if this part of an annual turn-over is taken as the measure of capital, most corporations which do a large business could all show a very low dividend rate.

In a sense, of course, expenditures may be said to be capital, but not in the sense in which the word is employed in any taxing laws, and not in the sense which is commonly ascribed to the word. The sum total of expenditures has usually a direct relation to the volume of business done; but it does not necessarily bear any relation to capital, because a concern with a small, although ample, capital may do a large business in one line, when the same volume of business, measured in money, may require a much larger capital in another line. To call the aggregate sum of all the money employed in buying and selling capital, when the same dollar may have been used any number of times, is to make "ducks and drakes" of words.

We appreciate fully that the taxing problem is a complicated and difficult one, and are in full sympathy with those whose duty it is to enforce the tax laws. It is much easier to declare what meaning phrases shall be held to have after a concrete case has been presented, than it is to choose or coin a phrase which will accurately express broad general principles, and just as accurately fit concrete cases which cannot even be anticipated. Due deference should be shown, as it always is shown, by the courts to the executive, administrative construction given to a tax law; but a tax cannot be imposed by the executive, nor by the courts, nor by both. Congress alone can impose it. It may well be that the mode of tax assessment adopted by the taxing authorities in this instance provides a better system of taxation than that of the act of 1917, and that Congress has given this mode the sanction of its approval by incorporating it in the act of 1918 (40 Stat. 1057) and of 1921 (42 Stat. 227); but, if it be there, it is there through a change in the law, and argues that it is not, rather than it is, in the act of 1917. If it be not there, we cannot write it in by anticipation of the later acts.

The conclusion reached is that indicated, that the plaintiff had in its business during the tax year no invested capital, and no more than a nominal capital, and was in consequence not subject to the payment of the graduated tax assessed against it, under the provisions of the act of 1917, and should have judgment for the excess of lawful tax paid.

The rule for a new trial is accordingly discharged, and plaintiff has leave to enter judgment on the verdict, following the usual practice.