## LEHMAN v. TAIT, Collector of Internal Revenue.

### No. 3237.

Circuit Court of Appeals, Fourth Circuit.
April 12, 1932.

William S. Hammers, of Washington, D. C., for appellant.

James K. Cullen, Sp. Asst. to U. S. Atty., and Simon E. Sobeloff, U. S. Atty., both of Baltimore, Md., for appellee.

Before PARKER and NORTHCOTT, Circuit Judges, and MEEKINS, District Judge.

NORTHCOTT, Circuit Judge.

This is an action brought by appellant, who was plaintiff below, in the District Court of the United States for the District of Maryland, against the appellee, seeking to recover taxes alleged to have been unlawfully assessed against and collected from the plaintiff for the year 1917. At the trial a jury was waived, and the issues, both of fact and law, were submitted to the judge, who found in favor of the defendant, from which action the plaintiff brought this appeal.

In the year in question the plaintiff was engaged in the cattle business in the city of Baltimore, operating the business as the sole proprietor under the name of N. Lehman & Bro., the business having been started under that name by his father and uncle many years before. The judge below made the following findings of fact:

"The plaintiff was in the business of buying and selling cattle. During the period in question he was the sole owner of the business. He was not obliged to keep on hand a stock of cattle in order to carry out the purposes of the business, but he seems to have arranged his purchases of cattle and his sales thereof in such a manner that deliveries were made directly from the cattle men or producers to the wholesale butchers who ultimately consumed them. The busy season ran from the middle of the year until the end of October or middle of November.

"The plaintiff made contracts for the sale of the cattle between himself as the seller and certain purchasers in New York, Philadelphia, and to a smaller extent in Baltimore. He bought the cattle from the producers through certain agents who traveled throughout the country and came in personal contact with the producers. Deliveries as said above were made through these agents from the place where the cattle were grown to the places of business where they were slaughtered.

"About twenty per cent. of the business was, according to the plaintiff's recollection, done in Baltimore, of which one-half approximately was on commission. The other one-half involved goods which the plaintiff bought and sold as he did with his other customers in other cities. A considerable part of the Baltimore sales was paid for in cash, but not all of them, some credit being extended by the plaintiff.

"The plaintiff was particularly fortunate, according to his recollection, in making collections from his Philadelphia and New York customers, and the larger part of his Baltimore customers, at or before the time when he was obliged to honor the drafts sent him by his agents who bought the cattle for him. According to the plaintiff's recollection, this was the case with the larger part of his business. He did not attempt to produce evidence in detail to substantiate the accuracy of his memory, but it was probably supported by the facts, for the business was done on a comparatively small amount of money. The gross sales were $2,864,000, the profits $180,295.93 and the money employed less than $80,000. It is nevertheless true that a substantial part of his sales was made on credit, for his accounts show that throughout the year, and particularly during the busy part of the year, there were large amounts of accounts receivable due and owing him on his books.

"The question of fact to determine is what capital the plaintiff employed, and whether it may be said that this amount was not more than nominal capital. It may be noted in passing that the plaintiff carried on his books a sum of money approximately $38,000, which represented certain invest-

ments derived by him from the estate of his father, which were not employed in the operation of the business. They were carried on the books of the business as a matter of convenience, since it was a one-man concern. The Court finds that this sum of money was not actually used in the business so far as it can determine from the evidence produced. * * *

"There is a stipulation in the case wherein the plaintiff admits that he used at least $12,000 a year as invested capital, and it is also agreed that if there should be included the earnings made by the plaintiff during the year, the amount of the invested capital was $23,320.13. It is obvious from a copy of a monthly balance sheet that has been introduced in evidence that the earnings of the business were used to some extent in the operation thereof during the year. It is, perhaps, difficult to ascertain precisely how much of the earnings was used, but certainly they were all available for use.

"The burden of proof is on the plaintiff in a matter of this sort, it seems to the Court, so that for the purposes of decision it seems more reasonable to the court to adopt the figure of $23,000 as that of the invested capital than the sum of $12,000, which the plaintiff concedes. The stipulation of the parties also suggests that if the amount of $100,000 withdrawn from the ordinary running accounts of the business on November 2nd, were considered as remaining in the business during the balance of the year, then the invested capital averaged throughout should be $38,000 a year. * * *

" * * * During all of this period, especially in the busy season, there were substantial amounts of money due and owing to the business. The accounts receivable were $42,131.66 on June 30th, and $142,440.06 on September 30th, and the average of the accounts receivable throughout the period must have been in excess of $60,000. These moneys were owed to the business in the way in which accounts receivable are usually due and owing to a mercantile business, and this is an ordinary attribute of a business which requires capital, namely the fact that the owner or merchant must wait upon the conveniences of his customers for the payment of their bills to a greater or lesser extent."

The court then held that the plaintiff was conducting a trade or business in which more than a nominal capital was invested, and therefore he could not recover the tax paid.

It is not necessary to quote authority to the effect that the findings of fact of a trial judge will not be reversed on appeal where there is substantial evidence, to sustain them. Here there was more than substantial evidence to support the findings of the judge. An examination of the record shows that there is practically no dispute as to the facts. In computing the amount of capital invested in plaintiff's business, the court excluded money borrowed and used in the business. While it is not necessary, to the determination of the questions here involved, to decide that point, we are of the opinion that borrowed money should be included in considering the question whether capital is more than nominal. The provision that borrowed money shall not be included refers to "invested capital" only. Section 207, Revenue Act of 1917, 40 Stat. 300, 306. De Laski & Thropp Circular Woven Tire Co. v. Iredell (D. C.) 268 F. 377. See, also, Park Amusement Co. v. McCaughn (D. C.) 14 F.(2d) 553; Porter et al. v. Lederer (D. C.) 267 F. 739; Hubbard-Ragsdale Co. v. Dean (D. C.) 15 F.(2d) 410; C. B. Fox & Co. v. United States, 66 Ct. Cl. 447.

The cases relied upon on behalf of appellant on this point [Cartier et al. v. Doyle (C. C. A.) 277 F. 150; Empire Fuel Co. v. Hays (D. C.) 295 F. 704; McManus-Heryer Brokerage Co. v. Crooks (D. C.) 28 F.(2d) 906], all refer to "invested capital" and not to "nominal capital." That the two are separate and distinct is clearly shown in section 209 of the act of 1917, where both classes of capital are mentioned.

There can be no doubt that there was invested capital used in appellant's business, and whether much or little that question is eliminated. There then remains the question whether the capital used was "more than nominal." The pertinent sections of the act of 1917 are:

"Sec. 201. That in addition to the taxes under existing law and under this act there shall be levied, assessed, collected, and paid for each taxable year upon the income of every corporation, partnership, or individual, a tax (hereinafter in this title referred to as the tax) equal to the following percentages of the net income: [Then follow graduated rates of taxes.] * * * *"

"Sec. 207. That as used in this title, the term 'invested capital' for any year means the average invested capital for the year, as defined and limited in this title, averaged monthly.

"As used in this title 'invested capital' does not include stocks, bonds (other than obligations of the United States), or other assets, the income from which is not subject to the tax imposed by this title, nor money or other property borrowed, and means, subject to the above limitations. * * * "

"Sec. 209. That in the case of a trade or business having no invested capital or not more than a nominal capital there shall be levied, assessed, collected and paid, in addition to the taxes under existing law and under this Act, in lieu of the tax imposed by section two hundred and one, a tax equivalent to eight per centum of the net income of such trade or business in excess of the following deductions. * * * "

Webster's New International Dictionary defines nominal as follows: "Existing in name only; not real or actual; merely named, stated, or given, without reference to actual conditions;—often with the implication that the thing named is so small, slight, or the like, in comparison to what might properly be expected, as scarcely to be entitled to the name; a nominal price."

Here the court below found that the invested capital amounted to approximately $23,000. Certainly a business that had at least $23,000 of invested capital, that carried on its books a capital account that ran as high as $154,000 in the year in question, and that had accounts due it of as much as $142,000 at one time, cannot be said to have only a "nominal capital."

Appellant had at one time, in the year in question, bought, paid for, and delivered cattle of the value of more than $140,000, for which he had not collected. It took more than nominal capital to conduct his business.

"The real criterion (that is, as to whether capital is merely nominal) is in the fact finding of whether money as an income producer played any real and substantial part in producing the income to be taxed. * * * " Park Amusement Co. v. McCaughn, supra. See, also, Glen Brook Coal Co. v. Lederer (D. C.) 34 F.(2d) 977; Dreyer Commission Co. v. Hellmich (C. C. A.) 25 F.(2d) 408; Hubbard-Ragsdale Co. v. Dean, supra; W. A. Gordon & Co., Limited, v. Lines (D. C.) 25 F.(2d) 894; Iredell v. De Laski & Thropp Circular Woven Tire Co. (C. C. A.) 290 F. 955.

On behalf of appellant two cases, decided by this court, Atlantic Coast Distributors v. Commissioner, 33 F.(2d) 733 and Strayer's Business College, Inc., v. Commissioner, 35 F.(2d) 426, are relied upon. In both these cases the question involved was that of a "personal service corporation," and an examination of these opinions will show the same line of reasoning as that followed here. In the Strayer's Business College Case, supra, will be found a holding as to what this court considers "nominal capital." The facts here do not bring this case within that holding.

The burden was upon the plaintiff to prove his case, and, as this court has repeatedly held, the action of the Commissioner of Internal Revenue in determining a tax assessment is prima facie correct. Brooks v. Commissioner (C. C. A.) 35 F.(2d) 178; Wright v. Commissioner (C. C. A.) 50 F.(2d) 727.

Here the facts sustained the Commissioner, and the plaintiff has not made his case.

A question as to whether the statute of limitations bars the action is raised, but, in view of our conclusion as to the merits, it is not necessary to discuss that question.

Affirmed.