No. 64,947

STATE OF KANSAS, *ex rel.* SECRETARY OF SOCIAL AND REHABILI-
TATION SERVICES, *Appellant,* v. CARRIE CONNER JACKSON,
*Appellee.*

(822 P.2d 1033)

Opinion filed December 6, 1991.

*Robert R. Hiller, Jr.,* of Department of Social and Rehabilitation Services, argued the cause, and *Reid Stacey,* of the same department, was with him on the briefs for appellant.

The opinion of the court was delivered by

MCFARLAND, J.: This action was brought by the State of Kansas, *ex rel.* Secretary of Social and Rehabilitation Services (SRS), against Carrie Conner Jackson for reimbursement of public assistance benefits paid during a period in which SRS had determined she was ineligible to receive such benefits. Such an action is authorized by K.S.A. 39-719b. The case was tried in a bench trial upon stipulated facts which incorporated certain depositions and interrogatories. The district court held in favor of the defendant, and the State appealed therefrom. The Court of Appeals affirmed the district court in *State ex rel. Secretary of SRS v.*

*Jackson*, 15 Kan. App. 2d 126, 803 P.2d 1045 (1990). The case is before us on the State's petition for review.

Jackson received benefits comprised of medical assistance, food stamps, and cash public assistance from May 1983 through February 1986 in the total amount of $35,565.11. Her benefits were terminated in February 1986 by SRS on the basis that her interests in two trusts were undisclosed available resources which rendered her ineligible for the benefits she had received. The two trusts, known as the Essmiller Trust and the Carrie Conner Jackson Irrevocable Trust (Jackson Trust), were established by W. D. Essmiller, Jackson's maternal grandfather prior to the time Jackson received SRS benefits herein. By the time the State's appeal was heard by the Court of Appeals, the State was no longer claiming the Essmiller Trust was an available resource to Jackson. We are concerned herewith solely with the Jackson Trust.

Before proceeding further, it is important to further delineate exactly what is and what is not involved in the case before us. The State brings this action under K.S.A. 39-719b, which provides:

"If at any time during the continuance of assistance to any person, the recipient thereof becomes possessed of any property or income in excess of the amount ascertained at the time of granting assistance, or if any of the recipient's circumstances which affect eligibility to receive assistance change from the time of determination of eligibility, it shall be the duty of the recipient to notify the secretary immediately of the receipt or possession of such property, income, or of such change in circumstances affecting eligibility and said secretary may, after investigation, cancel or modify the assistance payment in accordance with the circumstances.

"Any assistance paid shall be recoverable by the secretary as a debt due to the state. If during the life or on the death of any person receiving assistance, it is found that the recipient was possessed of income or property in excess of the amount reported or ascertained at the time of granting assistance, and if it be shown that such assistance was obtained by an ineligible recipient, the total amount of the assistance may be recovered by the secretary as a fourth class claim from the estate of the recipient or in an action brought against the recipient while living."

Thus, in this action, the State is contending Jackson is indebted to it in the amount of $35,565.11, this sum being the amount of assistance received by Jackson when she was an ineligible recipient. The trustees of the Jackson Trust are not parties hereto,

and no claim is asserted herein against them. The propriety of the termination by SRS of Jackson from receipt of future benefits is, likewise, not before us as Jackson did not appeal that administrative determination. The claim that Jackson received $35,565.11 in assistance is uncontroverted.

Although the posture of this case does not require us to analyze the particular benefits received, it is appropriate to state, generally, how eligibility is determined. The Court of Appeals explained:

"Eligibility requirements for general assistance, medical assistance, and assistance to families with dependent children (AFDC) are governed by K.S.A. 1989 Supp. 39-709. Assistance from programs involving federal funds is governed by K.S.A. 1989 Supp. 39-709(a), which provides in part that assistance 'may be granted to any needy person who: (1) Has insufficient income or resources to provide a reasonable subsistence compatible with decency and health.' The provision also permits SRS to establish income and resource exemptions as permitted by federal legislation.

"Eligibility for the AFDC program is governed by K.S.A. 1989 Supp. 39-709(b), which provides that assistance 'may be granted' to any dependent child or relative meeting the requirements of K.S.A. 1989 Supp. 39-709(a).

"Eligibility for general assistance programs not involving federal funds is governed by K.S.A. 1989 Supp. 39-709(d)(1), which provides in part:

'(A) To qualify for general assistance in any form a needy person must have insufficient income or resources to provide a reasonable subsistence compatible with decency and health and, except as provided for transitional assistance, be a member of a family in which a minor child or a pregnant woman resides or be unable to engage in employment.'

"Eligibility for medical assistance is governed by K.S.A. 1989 Supp. 39-709(e), which provides in part: '[M]edical assistance in accordance with such plan shall be granted to any person . . . whose resources and income do not exceed the levels prescribed by the secretary. In determining the need of an individual, the secretary may provide for income and resource exemptions and protected income and resource levels.'

"K.S.A. 39-719b authorizes an action for reimbursement of public assistance benefits and provides in part:

'Any assistance paid shall be recoverable by the secretary as a debt due to the state. If during the life or on the death of any person receiving assistance, it is found that the recipient was possessed of income or property in excess of the amount reported or ascertained at the time of granting assistance, and if it be shown that such assistance was obtained by an ineligible recipient, the total amount of the assistance may be recovered by the secretary as a fourth class claim from the estate of the recipient or in an action brought against the recipient while living.'

"Pursuant to the authority granted by K.S.A. 39-708c, the Secretary of SRS has issued a number of regulations concerning eligibility for public assistance benefits. K.A.R. 30-4-34 *et seq.* contain the eligibility requirements for most public assistance programs. Eligibility requirements for medical assistance programs (other than Medicaid) are contained in K.A.R. 30-6-34 *et seq.*

"K.A.R. 30-4-53 contains financial eligibility requirements for public assistance and provides in part:
'Each applicant or recipient shall be determined to be financially eligible if the client: (a) Owns property within the allowable limits;

'(b) has income that does not exceed 185% of the public assistance standards as set forth in K.A.R. 30-4-100; and

'(c) has a budgetary deficit after subtracting total applicable income from the public assistance standards.'

"While K.A.R. 30-4-53 has been restructured and the income eligibility standard has been adjusted, the basic eligibility requirements of the regulation have not changed since 1982. See K.A.R. 30-4-53 (1983); K.A.R. 30-4-53 (1982 Supp.).

"K.A.R. 30-4-106 (1983) contains 'rules for consideration of resources' of a public assistance applicant and provides in part:

'(a) Ownership for assistance purposes shall be determined by legal title. In the absence of a legal title, ownership shall be determined by possession.

'(b) Resources shall be real and of a nature that the value can be defined and measured. . . .

'(c) Resources shall be considered available both when actually available and when the applicant or recipient has the legal ability to make them available.

'(d) The resource value of property shall be that of the applicant's or recipient's equity in the property.'

"K.A.R. 30-4-109 provides a definition of personal property for eligibility purposes. K.A.R. 30-4-109(a)(2) provides: " 'Cash assets" means money, investments, cash surrender or loan values of life insurance policies, trust funds, and similar items on which a determinate amount of money can be realized.' This definition has not been changed since 1982. See K.A.R. 30-4-109(a)(2) (1982 Supp.).

"The provisions of K.A.R. 30-6-106 (1983), concerning medical assistance, are nearly identical to the provisions of K.A.R. 30-4-106. The current version of 30-6-106 contains an additional provision concerning trusts created by the applicant or their spouse. See K.A.R. 30-6-106(c)(2) (1990 Supp.). Even if this provision is deemed applicable to benefits granted in 1986 and earlier, the provision does not address a trust created by a grandparent.

"Essentially, the State argues the trust [fund was] an 'available' resource within the meaning of K.A.R. 30-4-106(c) and K.A.R. 30-6-106(c)(1). As noted, the resolution of this issue will depend upon the nature of Jackson's interest in the [trust]." 15 Kan. App. 2d at 127-29.

The trust provisions at issue are as follows:

"(A) During the lifetime of Carrie Conner Jackson, the Trustees, in their uncontrolled discretion, shall pay to Carrie Conner Jackson the net income of the Trust. In addition, the Trustees may pay to Carrie Conner Jackson, from the principal of the Trust from time to time, such amount or amounts as the Trustees in their uncontrolled discretion, may determine is necessary for the purposes of her health, education, support and maintenance. The Trustees are not prohibited from invading the principal of the trust for my granddaughter, Carrie Conner Jackson, before she has exhausted her own funds.

"(B) On the death of my granddaughter, Carrie Conner Jackson, the trust property shall be distributed among her issue, *per stirpes*, and held in separate trusts until all of her children reach the age of twenty-one (21) with the Trustees having the sole discretion to distribute the income and invade the principal for purposes of their health, education, support or maintenance. If she does not leave issue which survive her, but she leaves one or more brothers or sisters who survive her or who leave issue which survive her, the trust estate is to be divided and distributed to such brothers or sisters or their issue, *per stirpes*, and if Carrie Conner Jackson or her issue leave no issue, brothers, sisters or issue of such brothers or sisters which survive her, her share is to be divided and distributed to my daughter, Laverna Conner. However, in the event Laverna Conner shall be deceased, then, and in such event, the assets of this trust shall be distributed to Alvin Otte and Lorena Calcara, equally or to their issue, *per stirpes*.

"(C) The interest of each beneficiary and the income or principal of the trust created under this instrument shall be free from the control or interference of any creditor of a beneficiary or of any spouse of a married beneficiary and shall not be subject to attachment or susceptible of anticipation or alienation."

The parties stipulated that the Jackson Trust was "a discretionary trust with spendthrift provisions." The district court and the Court of Appeals accepted this categorization of the Jackson Trust. If we are bound by this stipulation, it controls the outcome of this case, as a discretionary trust is not an available resource to the beneficiary. We recognized the validity of discretionary trusts in *Watts v. McKay*, 160 Kan. 377, 162 P.2d 82 (1945).

The plaintiff in *Watts* sought an order compelling the trustee to pay a judgment for alimony. The court determined that a discretionary trust existed and stated:

"The beneficiary has no right, as a matter of law, to require the trustee to turn over to him the principal of the estate or any part of it. . . .

. . . .

". . . [The beneficiary] does not have such an interest in the corpus of the trust estate in the hands of the trustee as can be reached to satisfy the

judgment for alimony and attorney's fees, and . . . the trustee did not abuse his discretion in refusing to pay such judgment." 160 Kan. at 385.

In *Watts*, we cited with approval the provisions of the Restatement of Trusts § 155 (1935) concerning discretionary trusts. The present version of this treatise contains the same language:

"Except as stated in § 156, if by the terms of a trust it is provided that the trustee shall pay to or apply for a beneficiary only so much of the income and principal or either as the trustee in his uncontrolled discretion shall see fit to pay or apply, a transferee or creditor of the beneficiary cannot compel the trustee to pay any part of the income or principal." Restatement (Second) of Trusts § 155(1) (1957).

Comment b of this subsection states:

"A trust containing such a provision as is stated in this Section is a 'discretionary trust' and is to be distinguished from a spendthrift trust, and from a trust for support. In a discretionary trust it is the nature of the beneficiary's interest rather than a provision forbidding alienation which prevents the transfer of the beneficiary's interest. The rule stated in this Section is not dependent upon a prohibition of alienation by the settlor; but the transferee or creditor cannot compel the trustee to pay anything to him because the beneficiary could not compel payment to himself or application for his own benefit."

See 76 Am. Jur. 2d, Trusts § 164, pp. 401-02, as follows:

"A trust protective against the grantees or assignees and against the creditors of a beneficiary by virtue of a provision vesting discretion in the trustee to determine the time, amount, or manner of payments to a beneficiary generally, is recognized to be valid. The protection of such a trust results from the nature of the beneficiary's interest, and not from any restraint on alienation. The question in cases involving such trusts is not one of the power, but of the intention, of the testator or grantor to prohibit the anticipation or exclude the creditor or alienee, and if the court is satisfied of the intention in that respect, it will enforce it. Such a discretionary trust is sometimes called a spendthrift trust, although ordinarily it is distinguished from a true spendthrift trust. The discretion of the trustee may relate to payments for support and maintenance. But the fact that a trustee has a discretion to apply so much of the income as may be necessary for the support of the beneficiary and for other purposes does not remove the trust funds from liability for debts of the beneficiary, if the trustee has no right to exclude the beneficiary from the benefit thereof."

Restatement (Second) of Trusts § 157 (1957) provides:

"Although a trust is a spendthrift trust or a trust for support, the interest of the beneficiary can be reached in satisfaction of an enforceable claim against the beneficiary,

(a) by the wife or child of the beneficiary for support, or by the wife for alimony;

(b) for necessary services rendered to the beneficiary or necessary supplies furnished to him;

(c) for services rendered and materials furnished which preserve or benefit the interest of the beneficiary;

(d) by the United States or a State to satisfy a claim against the beneficiary."

The nature, construction, and legal effect of a written instrument are questions of law. Courts are not bound by stipulations as to questions of law. *Lightner v. Centennial Life Ins. Co.*, 242 Kan. 29, 31, 744 P.2d 840 (1987); *City of Lenexa v. Board of Johnson County Comm'rs*, 237 Kan. 782, 703 P.2d 800 (1985). We may determine for ourselves the type of trust created herein.

We believe the Jackson Trust clearly treats the income from the trust differently from the principal. For convenience, the key trust provision is iterated as follows:

"(A) During the lifetime of Carrie Conner Jackson, the Trustees, in their uncontrolled discretion, shall pay to Carrie Conner Jackson the net income of the Trust. In addition, the Trustees may pay to Carrie Conner Jackson, from the principal of the Trust from time to time, such amount or amounts as the Trustees in their uncontrolled discretion, may determine is necessary for the purposes of her health, education, support and maintenance. The Trustees are not prohibited from invading the principal of the trust for my granddaughter, Carrie Conner Jackson, before she has exhausted her own funds."

Stripped down, the provision states the Trustees shall pay the net income and, in addition, may pay from the principal. The payment of the net income is not tied to any determination of need as are payments from the principal.

Black's Law Dictionary 1375 (Centennial ed. 1991) defines "shall" as follows:

"As used in statutes, contracts, or the like, this word is generally imperative or mandatory. In common or ordinary parlance, and in its ordinary signification, the term 'shall' is a word of command, and one which has always or which must be given a compulsory meaning; as denoting obligation. The word in ordinary usage means 'must' and is inconsistent with a concept of discretion. People v. Municipal Court for Los Angeles Judicial Dist., 149 C.A.3d 951, 197 Cal. Rptr. 204, 206. It has the invariable significance of excluding the idea of discretion, and has the significance of operating to impose a duty which may be enforced, particularly if public policy is in favor of this meaning, or when addressed to public officials, or where a

public interest is involved, or where the public or persons have rights which ought to be exercised or enforced, unless a contrary intent appears. People v. O'Rourke, 124 Cal. App. 752, 13 P.2d 989, 992.

"But it may be construed as merely permissive or directory (as equivalent to 'may'), to carry out the legislative intention and in cases where no right or benefit to any one depends on its being taken in the imperative sense, and where no public or private right is impaired by its interpretation in the other sense. Wisdom v. Board of Sup'rs of Polk County, 236 Iowa 669, 19 N.W.2d 602, 607, 608."

Black's distinguishes its definition of "shall" from its definition of "may," as follows:

"An auxiliary verb qualifying the meaning of another verb by expressing ability, competency, liberty, permission, possibility, probability or contingency. U.S. v. Lexington Mill & E. Co., 232 U.S. 399, 34 S. Ct. 337, 340, 58 L. Ed. 658. Word 'may' usually is employed to imply permissive, optional or discretional, and not mandatory action or conduct. Shea v. Shea, Okl., 537 P.2d 417, 418. Regardless of the instrument, however, whether constitutional, statute, deed, contract or whatever, courts not infrequently construe 'may' as 'shall' or 'must' to the end that justice may not be the slave of grammar. However, as a general rule, the word 'may' will not be treated as a word of command unless there is something in context or subject matter of act to indicate that it was used in such sense. Bloom v. Texas State Bd. of Examiners of Psychologists, Tex. Civ. App., 475 S.W.2d 374, 377. In construction of statutes and presumably also in construction of federal rules word 'may' as opposed to 'shall' is indicative of discretion or choice between two or more alternatives, but context in which word appears must be controlling factor. U.S. v. Cook, C.A. Ill., 432 F. 2d 1093, 1098." Black's Law Dictionary 979.

True, the term "in their uncontrolled discretion" is used in the provisions relating to the payment of income and principal, but its usage in payment of income provisions is inconsistent with the "shall pay" language except perhaps as to the form of the payment. Since Jackson has been cut off welfare, the Trustees have been paying Jackson's rent, groceries, and baby-sitting costs by checks made out to the suppliers of such goods and services. How often the payments are made and the form of such payments are a matter of the Trustees' discretion. "Shall pay" so interpreted results in the payment of income not being a discretionary trust provision. This interpretation is consistent with what has actually occurred in this case. The parties stipulated that Jackson received "only nominal distribution from the Jackson Trust" during the period public assistance was received. In their briefs, the parties

ascribe different but equally valid definitions to the word "nominal." The State argues the amounts paid were small. Jackson uses the term in its meaning of in-name-only.

Webster's New Collegiate Dictionary 779 (1977) defines nominal as follows:

"1: of, relating to, or being a noun or a word or expression taking a noun construction 2a: of, relating to, or constituting a name b: bearing the name of a person 3a: existing or being something in name or form only ([nominal] head of his party) b: of, being, or relating to a designated or theoretical size that may vary from the actual: APPROXIMATE c: TRIFLING, INSIGNIFICANT 4: being according to plan: SATISFACTORY (everything was [nominal] during the spacecraft launch)."

See also the definition in Black's Law Dictionary at 1049:

"**Nominal.** Titular; existing in name only; not real or substantial; connected with the transaction or proceeding in name only, not in interest. Park Amusement Co. v. McCaughn, D.C.Pa., 14 F.2d 553, 556. Not real or actual; merely named, stated, or given, without reference to actual conditions; often with the implication that the thing named is so small, slight, or the like, in comparison to what might properly be expected, as scarcely to be entitled to the name; *e.g.*, a nominal price. Lehman v. Tait, C.C.A.Md., 58 F.2d 20, 23."

During the years in question, some $32,000 was reported on Jackson's income tax returns as having been received from Jackson Trust sources (directly from the Jackson Trust and from Affiliated Fund). Some income from the Jackson Trust was apparently invested in the Affiliated Fund. These amounts were apparently reported to the Internal Revenue Service by the Jackson Trust and Affiliated Fund as having been paid to Jackson, although it was a paper or nominal transaction in that the money was not physically received by Jackson. The Affiliated Fund reinvested the money. Such funds were apparently constructively delivered to Jackson. It could certainly be argued that such constructive delivery removed whatever discretion the Trustees may have had in these monies.

We believe our interpretation of the trust is consistent with the grantor's intention. W. D. Essmiller was concerned over his granddaughter's lifestyle, choice of a spouse, and financial responsibility. The Jackson Trust was intended to prevent her from decimating her inheritance and becoming destitute and, presumably, dependent upon public assistance for her support. The ac-

tion and inaction of the Trustees gave her no funds and resulted in instant destitution. Thus, the very thing the Jackson Trust was intended to prevent occurred immediately—instant destitution and dependence upon the taxpayers' largess for survival. Had SRS not become aware of the trust, presumably, SRS could have continued to support Jackson indefinitely. It should be noted that SRS does not contend Jackson acted willfully or fraudulently herein.

There is yet another reason to hold the income of the Jackson Trust was available to Jackson—public policy. Public assistance is available to the destitute and truly needy. It is not intended to provide subsistence to those with other resources. As was stated in *In re van Gaalen's Estate*, 38 Misc. 2d 853, 854-55, 239 N.Y.S.2d 312 (1963):

"The trust beneficiary is not able to work, earns no money and has no source of income other than the funds in the hands of the petitioner trustee. Although it cannot be seriously asserted that the public funds advanced to and for the trust beneficiary for his care and maintenance constitute income to him, the trustee has nevertheless taken the novel position that there appears to be no need for the invasion of the trust for the benefit of the trust beneficiary other than for small luxury items because the needs of the trust beneficiary are being taken care of by the Department of Welfare of the City of New York. The fallacious nature of this argument is readily exposed when one inquires what the position of the trustee would be if the Department of Welfare did not or refused to support and maintain the trust beneficiary. (Matter of Gruber, 122 N.Y.S.2d 654.) Charity bestowed by the State or any local political subdivision thereof to alleviate the suffering of the destitute is a grant or gift by an enlightened government that seeks to keep its less fortunate citizens from deprivation and want. It is in fact a gift by all the other citizens of the State and community who work, earn and pay taxes to the less fortunate who are unable to work and support themselves."

Public assistance funds are ever in short supply, and public policy demands they be restricted to those without resources of their own. The Jackson Trust's grantor intended that Jackson receive the income of the Trust regardless of need, and said income was an available resource under the applicable statutes and SRS regulations.

When this matter was tried to the district court, it was the position of SRS that all trust monies in both trusts, including income and corpus, were available assets to Jackson. Jackson

contended neither trust was an available resource. There was apparently no issue as to whether or not the total trust funds were insufficient to render her ineligible for the assistance received. As noted previously, SRS abandoned any claim as to the Essmiller Trust prior to its appeal being determined by the Court of Appeals. Because of the posture of the case in the district court, no evidence was introduced as to how much income the Jackson Trust had generated in the years in question.

We have held herein that the net income from the Jackson Trust was an available resource to Jackson. There has, of course, been no determination as to how much income there was or whether such income rendered Jackson ineligible in whole or in part for the assistance received. Accordingly, the case must be remanded to the district court for such determination.

Before concluding this opinion, there is another matter which is of concern—namely the many hats worn by Jackson's attorney, Mark D. Calcara. The evidence in this case indicates he:

1. was the attorney for W. D. Essmiller;·
2. drafted the Jackson Trust instrument;
3. has served as one of the two trustees of the Jackson Trust since its creation;
4. is the attorney for the other trustee, Willard Conner, Jr. (brother of Carrie Conner Jackson); and
5. represents the trust beneficiary in this action.

Obviously, it is the intention of the State to proceed against the Jackson Trust if successful herein. In any subsequent proceedings arising from this action, the trial court should insure that Carrie Conner Jackson has independent legal counsel.

The judgment of the Court of Appeals is affirmed in part and reversed in part. The judgment of the district court is affirmed in part and reversed in part, and the case is remanded to the district court for further proceedings consistent with this opinion.

ABBOTT, J., concurring and dissenting: Carrie's grandfather established the trusts because he was concerned whether Carrie could handle money and care for her own needs. At the time Carrie received assistance from SRS, she was married and the mother of two children. Over a 34-month period, SRS paid Carrie $35,565.11. Since SRS stopped assisting the family in February

1986, Carrie and her husband have divorced. Carrie is working in a sheltered workshop for the mentally and physically handicapped, building wooden pallets on a commission basis. The workshop staff picks her up at her apartment and takes her home. The trust pays her transportation costs ($30 a month) and her apartment rent ($285 a month with utilities paid). The trust also pays about $200 for groceries and other incidentals each month. The trust is paying approximately $515 a month for shelter, transportation, and food.

This case was brought by the State. According to the State's petition and briefs to the trial court, the State's position is that Carrie's grandfather established the trust in question for her benefit and that the State is entitled to take the income and invade the corpus as a matter of public policy, even though the trust is a spendthrift and discretionary trust.

We do not answer that issue. The trial court did not answer that issue nor did the Court of Appeals. The trial court and the Court of Appeals held the trust was a discretionary trust and that the State has no greater right than the trust beneficiary and, thus, the State could not invade the corpus or take the income. The majority opinion does not deal with that issue, which, in my opinion, leaves unanswered the only real issue raised by the State in the trial court.

I am also concerned because the State stipulated the trust was "a discretionary trust with spendthrift provisions." I suspect the State so stipulated because the executor of Carrie's grandfather's estate previously petitioned the court to interpret the trust language that is also the subject of this appeal. Carrie and the trustees appeared in that proceeding. The court held

"that the language is clear and unambiguous and that the Trustees have discretionary power to pay out, if the Trustees so elect to do so, any net income in their uncontrolled discretion; provided, further, the Trustees are under no obligation to pay any net income from the Trust during the life of Carrie Conner Jackson, but in the event the Trustees deem it advisable to do so, any income paid out during the lifetime of Carrie Conner Jackson shall be paid to Carrie Conner Jackson.

"5. That such power of distribution of net income is solely within the Trustees['] discretion and completely within their control as to whether or not distributions of income shall be made, if at all, to Carrie Conner Jackson during her lifetime."

None of the parties appealed the court's construction of the trust. Although it is part of the record on appeal, the parties in the present action did not mention that prior court determination at either the trial court or appellate court level. The State must claim through Carrie, and if Carrie is bound by the previous decision (res judicata), so is the State.

The trial court in this case also held that the trust was discretionary. On appeal to the Court of Appeals, the State contended that "public policy" allowed the State to take the income and to invade the corpus of a discretionary and spendthrift trust.

The Court of Appeals panel unanimously upheld the trial court's decision, and the State's petition for review with this court was granted. The State, in my opinion, changed its position before this court and took a position it had never taken before by arguing that the fundamental issue is whether Carrie was eligible for public assistance during the time she received it.

Two trial judges and three members of the Court of Appeals held that the provisions in question were unambiguous and established a discretionary trust. This court found the same provisions to be unambiguous and the trustees' only discretion concerning income from the trust was the manner in which it should be paid to Carrie.

I look at the fact that five other competent judges (the original trial judge in the estate proceedings, the trial judge in this case, and the three-judge Court of Appeals panel) reached a different conclusion from the six-person majority of this court. I question both groups' judgment that the phrase in question is unambiguous.

There is evidence in the record that the grandfather was dissatisfied with Carrie's lifestyle. He changed the original trust instrument to add the discretionary language. The persons named as trustees were relatives who appear to have discussed the trust with the grandfather and who were of the opinion they had absolute discretion. A trustee already has considerable discretion regarding how and when to pay funds to the trust beneficiary. At a minimum, I would reverse on this issue and remand the case to the trial court to determine the grandfather's intent.

I do not place as much reliance on "shall" and "may" as does the majority.

This state has consistently followed the Restatement of Trusts, and the majority sets out Restatement (Second) of Trusts § 155 (1957). In the case at bar—as to income—the trust instrument before us uses the exact language "the trustee *shall* pay . . . in his *uncontrolled discretion*" (emphasis supplied) as an example of when a discretionary trust is created. Here, the trust instrument follows the Restatement of Trusts' exact language to create a discretionary trust.

The majority relies on the fact that the trust instrument uses "may" when it speaks of invading the corpus. A careful reading of the majority opinion reveals authority that justice should not be the slave of grammar, that "shall" and "may" are frequently interpreted by courts to mean the same, and that the context in which the words appear must be the controlling factor.

I am not persuaded that "uncontrolled discretion" refers to the form of payment. The trustee already has as much discretion in that arena as "uncontrolled discretion" would give.

In summary, I believe the trust instrument to be ambiguous. However, in my opinion, that issue has been decided and is res judicata. The bottom line is that the issue presented in the trial court and Court of Appeals was whether the State has the right to take the net income of a discretionary trust to reimburse itself for welfare payments and, if the income is insufficient to do so, to invade the corpus of a discretionary trust. I would decide that case on that issue. I would reach the same result, *i.e.*, that the State can reach the net income of a discretionary trust when the State has furnished necessities to the trust beneficiary. I would do so on the basis of public policy and on the authority of Restatement (Second) of Trusts § 157 (1957) cited in the majority opinion. I would not permit the State to invade the corpus of this discretionary trust.